HODEL, ACTING SECRETARY OF THE INTERIOR *v.*
VIRGINIA SURFACE MINING & RECLAMATION
ASSOCIATION, INC., ET AL.

No. 79–1538. Argued February 23, 1981—Decided June 15, 1981*

---

*Together with No. 79–1596, *Virginia Surface Mining & Reclamation Association, Inc., et al.* v. *Hodel, Acting Secretary of the Interior, et al.,* also on appeal from the same court.

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., filed a concurring statement, *post,* p. 305. POWELL, J., filed a concurring opinion, *post,* p. 305. REHNQUIST, J., filed an opinion concurring in the judgment, *post,* p. 307.

*Peter Buscemi* argued the cause for appellant in No. 79–1538 and appellees in No. 79–1596. With him on the briefs were *Solicitor General McCree, Acting Assistant Attorney General Sagalkin,* and *Michael A. McCord.*

*Marshall Coleman,* Attorney General of Virginia, argued the cause for appellees in No. 79–1538 and appellants in No. 79–1596. With him on the brief for appellees Virginia Surface Mining & Reclamation Association, Inc., et al. were *Roger L. Chaffe* and *Gregory M. Luce,* Assistant Attorneys General, and *John L. Kilcullen. Robert T. Copeland* filed a brief for the Town of St. Charles et al., appellees under this Court's Rule 10.4, in both cases.†

---

†*Norman L. Dean, Jr.,* filed a brief for the National Wildlife Federation et al. as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Alaska et al. by *Wilson L. Condon,* Attorney General of Alaska, *Wayne Minami,* Attorney General of Hawaii, and *Johnson H. Wong,* Deputy Attorney General, *David H. Leroy,* Attorney General of Idaho, *Steven L. Beshear,* Attorney General of Kentucky, *William J. Guste, Jr.,* Attorney General of Louisiana, and *Gary L. Keyser* and *Carmack M. Blackmon,* Assistant Attorneys General, *Paul J. Douglas,* Attorney General of Nebraska, and *Judy K. Hoffman,* Assistant Attorney General, *Jeff Bingaman,* Attorney General of New Mexico, *Jan Eric Cartwright,* Attorney General of Oklahoma, *Dennis J. Roberts II,* Attorney General of Rhode Island, *Mark V. Meierhenry,* Attorney General of South Dakota, and *Robert B. Hansen,* Attorney General of Utah; for the State of Arizona et al. by *Robert C. Corbin,* Attorney General of Arizona, *Wayne Minami,* Attorney General of Hawaii, and *Johnson H. Wong,* Deputy Attorney General, *Richard H. Bryan,* Attorney General of Nevada, *Larry D. Struve,* Chief Deputy Attorney General, and *Harry W. Swainston,* Deputy Attorney General, *Allen I. Olson,* Attorney General of North Dakota, and *Ray Walton,* Special Assistant Attorney General, *James M. Brown,* Attorney General of Oregon, *Robert B. Hansen,* Attorney General of Utah, *Slade Gorton,* Attorney General of Washington, and *John D. Troughton,* Attorney General of Wyoming; for the State of Illinois by *Tyrone C. Fahner,* Attorney General, and *Harvey M. Sheldon;* for the State of Texas by *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Richard E. Gray III,* Executive Assistant Attorney General, and *Justin Andrew Kever,* Assistant Attorney General; for Coal Operators and Associates, Inc., by *John Robert Leathers, Joseph J. Zaluski,* and *Eugene F. Mooney;* for the Mountain States Legal Foundation by *Roger J. Marzulla;* for the National Coal Association et al. by *John A.*

JUSTICE MARSHALL delivered the opinion of the Court.

These cases arise out of a pre-enforcement challenge to the constitutionality of the Surface Mining Control and Reclamation Act of 1977 (Surface Mining Act or Act), 91 Stat. 447, 30 U. S. C. § 1201 *et seq.* (1976 ed., Supp. III). The United States District Court for the Western District of Virginia declared several central provisions of the Act unconstitutional and permanently enjoined their enforcement. 483 F. Supp. 425 (1980). In these appeals, we consider whether Congress, in adopting the Act, exceeded its powers under the Commerce Clause of the Constitution,[1] or transgressed affirmative limitations on the exercise of that power contained in the Fifth and Tenth Amendments. We conclude that in the context of a facial challenge, the Surface Mining Act does not suffer from any of these alleged constitutional defects, and we uphold the Act as constitutional.

## I

### A

The Surface Mining Act is a comprehensive statute designed to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." § 102 (a), 30 U. S. C. § 1202 (a) (1976 ed., Supp. III). Title II of the Act, 30 U. S. C. § 1211 (1976 ed., Supp. III), creates the Office of Surface Mining Reclamation and Enforcement (OSM), within the Department of the Interior, and the Secretary of the Interior (Secretary) acting through OSM, is charged with primary responsibility for ad-

---

*MacLeod,* and *Richard McMillan, Jr.;* and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *Raymond M. Momboisse.*

*Eugene F. Mooney, George L. Seay, Jr.,* and *John Robert Leathers* filed a brief for Pike County, Kentucky, as *amicus curiae.*

[1] The Commerce Clause empowers Congress "[t]o regulate Commerce with foreign Nations and among the several States, and with the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3.

ministering and implementing the Act by promulgating regulations and enforcing its provisions. § 201 (c), 30 U. S. C. § 1211 (c) (1976 ed., Supp. III). The principal regulatory and enforcement provisions are contained in Title V of the Act, 91 Stat. 467–514, 30 U. S. C. §§ 1251–1279 (1976 ed., Supp. III). Section 501, 30 U. S. C. § 1251 (1976 ed., Supp. III), establishes a two-stage program for the regulation of surface coal mining: an initial, or interim regulatory phase, and a subsequent, permanent phase. The interim program mandates immediate promulgation and federal enforcement of some of the Act's environmental protection performance standards, complemented by continuing state regulation. Under the permanent phase, a regulatory program is to be adopted for each State, mandating compliance with the full panoply of federal performance standards, with enforcement responsibility lying with either the State or Federal Government.

Section 501 (a) directs the Secretary to promulgate regulations establishing an interim regulatory program during which mine operators will be required to comply with some of the Act's performance standards, as specified by § 502 (c), 30 U. S. C. § 1252 (c) (1976 ed., Supp. III). Included among those selected standards are requirements governing: (a) restoration of land after mining to its prior condition; (b) restoration of land to its approximate original contour; (c) segregation and preservation of topsoil; (d) minimization of disturbance to the hydrologic balance; (e) construction of coal mine waste piles used as dams and embankments; (f) revegetation of mined areas; and (g) spoil disposal. § 515 (b), 30 U. S. C. § 1265 (b) (1976 ed., Supp. III).[2] The interim

---

[2] Other provisions of the Act are, by their own terms, made effective during the interim period. One example is § 522 (e), 30 U. S. C. § 1272 (e) (1976 ed., Supp. III), which prohibits, with some exceptions, surface coal mining on certain lands or within specified distances of particular structures or facilities.

regulations were published on December 13, 1977, see 42 Fed. Reg. 62639,[3] and they are currently in effect in most States, including Virginia.[4]

The Secretary is responsible for enforcing the interim regulatory program. § 502 (e), 30 U. S. C. § 1252 (e) (1976 ed., Supp. III). A federal enforcement and inspection program is to be established for each State, and is to remain in effect until a permanent regulatory program is implemented in the State. States may issue permits for surface mining operations during the interim phase, but operations authorized by such permits must comply with the federal interim performance standards. § 502 (b), 30 U. S. C. § 1252 (b) (1976 ed., Supp. III). States may also pursue their own regulatory and inspection programs during the interim phase, and they may

---

[3] Under §§ 502 (b), (c) of the Act, 30 U. S. C. §§ 1252 (b), (c) (1976 ed., Supp. III), the interim standards are applicable only to surface mining operations in States that were themselves regulating surface mining when the Act became law. All States in which surface mining was conducted on private lands had regulatory programs of their own when the Act was passed in 1977. Accordingly, the interim program became applicable in all relevant areas throughout the country, including Virginia.

[4] New surface mining operations, excluding those on "Federal lands" or "Indian lands," commencing on or after February 3, 1978, must comply with the performance standards established by the interim regulatory program at the start of operations. And, with certain limited exceptions, surface mining operations begun prior to February 3, 1978, were required to be in compliance with the interim regulations as of May 3, 1978. §§ 502 (b), (c), and 701 (11), 30 U. S. C. §§ 1252 (b), (c), and 1291 (11) (1976 ed., Supp. III).

Some of the interim regulations were challenged in the United States District Court for the District of Columbia pursuant to § 526 (a)(1) of the Act, 30 U. S. C. § 1276 (a)(1) (1976 ed., Supp. III). *In re Surface Mining Regulation Litigation,* 452 F. Supp. 327 (1978); *In re Surface Mining Regulation Litigation,* 456 F. Supp. 1301 (1978), aff'd in part and rev'd in part, 201 U. S. App. D. C. 360, 627 F. 2d 1346 (1980). The plaintiffs in the District of Columbia litigation also challenged the validity of a number of the statutory provisions that are at issue in the instant cases. The District Court sustained the validity of those provisions, 456 F. Supp., at 1319–1321, and the attack was not renewed on appeal.

assist the Secretary in enforcing the interim standards.[5] The States are not, however, required to enforce the interim regulatory standards and, until the permanent phase of the program, the Secretary may not cede the Federal Government's independent enforcement role to States that wish to conduct their own regulatory programs.

Section 501 (b), 30 U. S. C. § 1251 (b) (1976 ed., Supp. III), directs the Secretary to promulgate regulations establishing a permanent regulatory program incorporating all the Act's performance standards. The Secretary published the permanent regulations on March 13, 1979, see 44 Fed. Reg. 14902, but these regulations do not become effective in a particular State until either a permanent state program, submitted and approved in accordance with § 503 of the Act, or a permanent federal program for the State, adopted in accordance with § 504, is implemented.

Under § 503, any State wishing to assume permanent regulatory authority over the surface coal mining operations on "non-Federal lands"[6] within its borders must submit a proposed permanent program to the Secretary for his approval. The proposed program must demonstrate that the state legislature has enacted laws implementing the environmental protection standards established by the Act and accompanying regulations, and that the State has the administrative and technical ability to enforce these standards. 30 U. S. C. § 1253 (1976 ed., Supp. III). The Secretary must approve or disapprove each such proposed program in accordance with time schedules and procedures established by §§ 503 (b), (c),

[5] Congress encouraged such assistance by providing for financial reimbursements to States that actively assist the federal enforcement effort during the interim phase. See 30 U. S. C. § 1252 (e)(4) (1976 ed., Supp. III).

[6] A separate regulatory program governing "Federal lands" is established by § 523 of the Act, 30 U. S. C. § 1273 (1976 ed., Supp. III). The term "Federal lands" is defined in § 701 (4), 30 U. S. C. § 1291 (4) (1976 ed., Supp. III). Section 710 of the Act, 30 U. S. C. § 1300 (1976 ed., Supp. III), regulates surface mining on "Indian lands."

30 U. S. C. §§ 1253 (b), (c) (1976 ed., Supp. III).[7] In addition, the Secretary must develop and implement a federal permanent program for each State that fails to submit or enforce a satisfactory state program. § 504, 30 U. S. C. § 1254 (1976 ed., Supp. III). In such situations, the Secretary constitutes the regulatory authority administering the Act within that State and continues as such unless and until a "state program" is approved. No later than eight months after adoption of either a state-run or federally administered permanent regulatory program for a State, all surface coal mining and reclamation operations on "non-Federal lands" within that State must obtain a new permit issued in accordance with the applicable regulatory program. § 506 (a), 30 U. S. C. § 1256 (a) (1976 ed., Supp. III).

---

[7] The proposed state programs were to have been submitted by February 3, 1979—18 months after the Act was passed. Exercising his authority under § 504 (a), the Secretary extended the deadline until August 3, 1979. See 44 Fed. Reg. 15324 (1979). Because the Secretary's March 1979 publication of the permanent regulations occurred seven months after the date set by the Act, see 30 U. S. C. § 1251 (b) (1976 ed., Supp. III), the United States District Court for the District of Columbia further extended the deadline for submission of state programs to and including March 3, 1980. *In re Permanent Surface Mining Regulation Litigation,* Civ. No. 79–1144 (DC July 25 and Aug. 21, 1979). See also 44 Fed. Reg. 60969 (1979) (announcing conforming changes in the Secretary's regulations governing submission of state programs).

With the exception of Alaska, Georgia, and Washington, all States in which surface mining is either conducted or is expected to be conducted submitted proposed state programs to the Secretary by March 3, 1980. The Secretary has made his initial decisions on these programs. Three programs were approved, 8 were approved on condition that the States agree to some modifications, 10 were approved in part and disapproved in part, and 3 were disapproved because the state legislatures had failed to enact the necessary implementing statutes. Virginia's program was among those approved in part and disapproved in part. See 45 Fed. Reg. 69977 (1980). Under § 503 of the Act, a State may revise a plan that has been disapproved in whole or in part and resubmit it to the Secretary within 60 days of his initial decision.

## B

On October 23, 1978, the Virginia Surface Mining and Reclamation Association, Inc., an association of coal producers engaged in surface coal mining operations in Virginia, 63 of its member coal companies, and 4 individual landowners filed suit in Federal District Court seeking declaratory and injunctive relief against various provisions of the Act. The Commonwealth of Virginia and the town of Wise, Va., intervened as plaintiffs.[8] Plaintiffs' challenge was primarily directed at Title V's performance standards.[9] Because the permanent regulatory program was not scheduled to become effective until June 3, 1980, plaintiffs' challenge was directed at the sections of the Act establishing the interim regulatory program. Plaintiffs alleged that these provisions violate the Commerce Clause, the equal protection and due process guarantees of the Due Process Clause of the Fifth Amendment,[10] the Tenth Amendment,[11] and the Just Compensation Clause of the Fifth Amendment.[12]

The District Court held a 13-day trial on plaintiffs' request for a permanent injunction. The court subsequently

---

[8] The Virginia Citizens for Better Reclamation, Inc., and the town of St. Charles, Va., intervened as defendants in support of the Secretary.

[9] Plaintiffs also challenged Title IV of the Act, 30 U. S. C. §§ 1231–1243 (1976 ed., Supp. III), which establishes a reclamation program for abandoned mines. The District Court, held, however, that it would exercise its discretion by "not grant[ing] declaratory judgments as to the provisions of that title." 483 F. Supp. 425, 429 (1980). There is no appeal from this portion of the District Court's judgment.

[10] The Due Process Clause of the Fifth Amendment states that no person shall "be deprived of life, liberty, or property, without due process of law."

[11] Under the Tenth Amendment, "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

[12] The Compensation Clause prohibits the taking of private property "for public use, without just compensation."

issued an order and opinion declaring several central provisions of the Act unconstitutional. 483 F. Supp. 425 (1980). The court rejected plaintiffs' Commerce Clause, equal protection, and substantive due process challenges to the Act. The court held, however, that the Act "operates to 'displace the States' freedom to structure integral operations in areas of traditional functions,' . . . and, therefore, is in contravention of the Tenth Amendment." *Id.;* at 435, quoting *National League of Cities* v. *Usery,* 426 U. S. 833, 852 (1976). The court also ruled that various provisions of the Act effect an uncompensated taking of private property in violation of the Just Compensation Clause of the Fifth Amendment. Finally, the court agreed with plaintiffs' due process challenges to some of the Act's enforcement provisions. The court permanently enjoined the Secretary from enforcing various provisions of the Act.[13]

In No. 79–1538, the Secretary appeals from that portion of the District Court's judgment declaring various sections of the Act unconstitutional and permanently enjoining their enforcement. In No. 79–1596, plaintiffs cross-appeal from the District Court's rejection of their Commerce Clause challenge to the Act.[14] Because of the importance of the issues raised, we noted probable jurisdiction of both appeals,[15] 449 U. S.

---

[13] The District Court denied the Secretary's motion for a stay pending direct appeal to this Court. At the same time, the court issued an order and opinion clarifying and modifying its earlier order. App. to Juris. Statement in No. 79–1538, pp. 1a–16a (J. S. App.). Upon the Secretary's application, we issued an order staying the District Court's judgment "pending the timely filing and disposition of the appeal[s] in this Court."

[14] Plaintiffs do not appeal from that portion of the District Court's judgment rejecting their equal protection and substantive due process challenges to the Act.

[15] The jurisdiction of this Court was invoked under 28 U. S. C. § 1252, which provides for direct appeal to this Court from any decision by a court of the United States invalidating an Act of Congress in any suit to which the United States, its agencies, officers, or employees are parties.

817 (1980), and consolidated the two cases.[16] For conven-
ience, we shall usually refer to plaintiffs as "appellees."

## II

On cross-appeal, appellees argue that the District Court
erred in rejecting their challenge to the Act as beyond the
scope of congressional power under the Commerce Clause.
They insist that the Act's principal goal is regulating the use
of private lands within the borders of the States and not, as
the District Court found, regulating the interstate commerce
effects of surface coal mining. Consequently, appellees con-
tend that the ultimate issue presented is "whether land *as
such* is subject to regulation under the Commerce Clause,
*i. e.* whether land can be regarded as 'in commerce.'" Brief
for Virginia Surface Mining & Reclamation Association, Inc.,
et al. 12 (emphasis in original). In urging us to answer "no"
to this question, appellees emphasize that the Court has rec-
ognized that land-use regulation is within the inherent police
powers of the States and their political subdivisions,[17] and

---

[16] We also agreed to hear the appeal in No. 80–231, *Hodel* v. *Indiana,*
which involves similar constitutional challenges to different provisions of
the Surface Mining Act, and which we also decide today. *Post,* p. 314.
At least three other District Courts have considered constitutional chal-
lenges to provisions of the Surface Mining Act. In *Concerned Citizens of
Appalachia, Inc.* v. *Andrus,* 494 F. Supp. 679 (ED Tenn. 1980), appeal
pending, No. 80–1488 (CA6), the District Court upheld the Act in the
face of challenges similar to those raised by plaintiffs in the instant case.
In *Star Coal Co.* v. *Andrus,* No. 79–171–2 (SD Iowa, Feb. 13, 1980),
appeal dism'd, No. 80–1284 (CA8), the District Court rejected challenges
based on the Fifth and Tenth Amendments, but enjoined some of the Act's
enforcement provisions. And in *Andrus* v. *P–Burg Coal Co.,* 495 F. Supp.
82 (SD Ind. 1980), aff'd, 644 F. 2d 1231 (CA7 1981), the District Court
rejected a Commerce Clause challenge to the Act.

[17] Appellees cite cases such as *Village of Belle Terre* v. *Boraas,* 416
U. S. 1 (1974); *Berman* v. *Parker,* 348 U. S. 26 (1954); *Euclid* v. *Ambler
Realty Co.,* 272 U. S. 365 (1926).

argue that Congress may regulate land use only insofar as the Property Clause [18] grants it control over federal lands.

We do not accept either appellees' framing of the question or the answer they would have us supply. The task of a court that is asked to determine whether a particular exercise of congressional power is valid under the Commerce Clause is relatively narrow. The court must defer to a congressional finding that a regulated activity affects interstate commerce, if there is any rational basis for such a finding. *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 258 (1964); *Katzenbach* v. *McClung,* 379 U. S. 294, 303–304 (1964). This established, the only remaining question for judicial inquiry is whether "the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution." *Heart of Atlanta Motel, Inc.* v. *United States, supra,* at 262. See *United States* v. *Darby,* 312 U. S. 100, 121 (1941); *Katzenbach* v. *McClung,* 379 U. S., at 304. The judicial task is at an end once the court determines that Congress acted rationally in adopting a particular regulatory scheme. *Ibid.*

Judicial review in this area is influenced above all by the fact that the Commerce Clause is a grant of plenary authority to Congress. See *National League of Cities* v. *Usery, supra,* at 840; *Cleveland* v. *United States,* 329 U. S. 14, 19 (1946); *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 37 (1937). This power is "complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution." *Gibbons* v. *Ogden,* 9 Wheat. 1, 196 (1824). Moreover, this Court has made clear that the commerce power extends not only to "the use of channels of interstate or foreign commerce" and

---

[18] The Property Clause provides: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U. S. Const., Art. IV, § 3, cl. 2.

to "protection of the instrumentalities of interstate commerce . . . or persons or things in commerce," but also to "activities affecting commerce." *Perez* v. *United States*, 402 U. S. 146, 150 (1971). As we explained in *Fry* v. *United States*, 421 U. S. 542, 547 (1975), "[e]ven activity that is purely intrastate in character may be regulated by Congress, where the activity, combined with like conduct by others similarly situated, affects commerce among the States or with foreign nations." See *National League of Cities* v. *Usery*, 426 U. S., at 840; *Heart of Atlanta Motel, Inc.* v. *United States, supra*, at 255; *Wickard* v. *Filburn*, 317 U. S. 111, 127–128 (1942); *United States* v. *Wrightwood Dairy Co.*, 315 U. S. 110, 119 (1942); *United States* v. *Darby, supra*, at 120–121.

Thus, when Congress has determined that an activity affects interstate commerce, the courts need inquire only whether the finding is rational. Here, the District Court properly deferred to Congress' express findings, set out in the Act itself, about the effects of surface coal mining on interstate commerce. Section 101 (c), 30 U. S. C. § 1201 (c) (1976 ed., Supp. III), recites the congressional finding that

> "many surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources."

The legislative record provides ample support for these statutory findings. The Surface Mining Act became law

278

only after six years of the most thorough legislative consideration.[19] Committees of both Houses of Congress held extended hearings during which vast amounts of testimony and

[19] Hearings on proposed legislation regulating surface coal mining began in 1968. Surface Mining Reclamation: Hearings before the Senate Committee on Interior and Insular Affairs, 90th Cong., 2d Sess. (1968). Three years later, additional hearings were held by Committees of both the House and the Senate. Regulation of Strip Mining: Hearings before the Subcommittee on Mines and Mining of the House Committee on Interior and Insular Affairs, 92d Cong., 1st Sess. (1971); Surface Mining: Hearings before the Subcommittee on Minerals, Materials and Fuels of the Senate Committee on Interior and Insular Affairs, 92d Cong., 1st Sess. (1972). The Committees reported bills for consideration by their respective Houses. The House passed H. R. 6482, but Congress adjourned before the Senate could act on the measure.

Similar bills were reintroduced in the 93d Congress and further hearings were held. Regulation of Surface Mining Operations: Hearings before the Senate Committee on Interior and Insular Affairs, 93d Cong., 1st Sess. (1973); Regulation of Surface Mining: Hearings before the Subcommittee on the Environment and the Subcommittee on Mines and Mining of the House Committee on Interior and Insular Affairs, 93d Cong., 1st Sess. (1973). At the request of the Chairman of the Senate Committee, the Council on Environmental Quality prepared a report entitled Coal Surface Mining and Reclamation: An Environmental and Economic Assessment of Alternatives (Comm. Print 1973), and the Senate Committee held additional hearings to consider the report. Coal Surface Mining and Reclamation: Hearings before the Subcommittee on Minerals, Materials and Fuels of the Senate Committee on Interior and Insular Affairs, 93d Cong., 1st Sess. (1973). The House and Senate Committees reported bills for consideration by both Houses, and Congress passed a bill that was vetoed by President Ford in 1974.

The surface mining legislation was reintroduced in the 94th Congress in 1975, and the Senate Committee held a hearing on administration objections to the bill. Surface Mining Briefing: Briefing before the Senate Committee on Interior and Insular Affairs, 94th Cong., 1st Sess. (1975). Both Committees reported bills to the House and Senate, which again passed a bill reported by the Conference Committee. President Ford again vetoed the bill.

The protracted congressional endeavor finally bore fruit in 1977. The relevant House and Senate Committees held extensive hearings shortly after the opening of the 95th Congress to consider bills introduced at the

documentary evidence about the effects of surface mining on our Nation's environment and economy were brought to Congress' attention. Both Committees made detailed findings about these effects and the urgent need for federal legislation to address the problem. The Senate Report explained that

> "[s]urface coal mining activities have imposed large social costs on the public . . . in many areas of the country in the form of unreclaimed lands, water pollution, erosion, floods, slope failures, loss of fish and wildlife resources, and a decline in natural beauty." S. Rep. No. 95–128, p. 50 (1977).

See *id.*, at 50–54.

Similarly, the House Committee documented the adverse effects of surface coal mining on interstate commerce as including:

> " 'Acid drainage which has ruined an estimated 11,000 miles of streams; the loss of prime hardwood forest and the destruction of wildlife habitat by strip mining; the degrading of productive farmland; recurrent

very beginning of the new legislative session. Surface Mining Control and Reclamation Act of 1977: Hearings on S. 7 before the Subcommittee on Public Lands and Resources of the Senate Committee on Energy and Natural Resources, 95th Cong., 1st Sess. (1977) (1977 Senate Hearings); Surface Mining Control and Reclamation Act of 1977: Hearings on H. R. 2 before the Subcommittee on Energy and the Environment of the House Committee on Interior and Insular Affairs, 95th Cong., 1st Sess. (1977) (1977 House Hearings). The legislation was reported to both Houses and passage in both Chambers followed, after lengthy floor debate. 123 Cong. Rec. 12861–12886, 15691–15755 (1977). The Conference Committee Report was issued in July 1977, H. R. Conf. Rep. No. 95–493 (1977), and after further floor debate, both Houses agreed to the bill recommended by the conferees. 123 Cong. Rec. 23967–23988, 24419–24429 (1977). President Carter signed the Act into law on August 3, 1977. The legislative history of the Act is summarized in S. Rep. No. 95–128, pp. 59–61 (1977), and in H. R. Rep. No. 95–218, pp. 140–141 (1977). See also Note, 81 W. Va. L. Rev. 775 (1979).

landslides; siltation and sedimentation of river systems . . . .' " H. R. Rep. No. 95–218, p. 58 (1977), quoting H. R. Rep. No. 94–1445, p. 19 (1976).

And in discussing how surface coal mining affects water resources and in turn interstate commerce, the House Committee explained:

"The most widespread damages . . . are environmental in nature. Water users and developers incur significant economic and financial losses as well.

"Reduced recreational values, fishkills, reductions in normal waste assimilation capacity, impaired water supplies, metals and masonry corrosion and deterioration, increased flood frequencies and flood damages, reductions in designed water storage capacities at impoundments, and higher operating costs for commercial waterway users are some of the most obvious economic effects that stem from mining-related pollution and sedimentation." H. R. Rep. No. 95–218, at 59.

See id., at 96–122.

The Committees also explained that inadequacies in existing state laws and the need for uniform minimum nationwide standards made federal regulations imperative. See S. Rep. No. 95–128, at 49; H. R. Rep. No. 95–218, at 58. In light of the evidence available to Congress and the detailed consideration that the legislation received, we cannot say that Congress did not have a rational basis for concluding that surface coal mining has substantial effects on interstate commerce.

Appellees do not, in general, dispute the validity of the congressional findings.[20] Rather, appellees' contention is that

---

[20] Appellees do contend that surface mining enhances rather than diminishes the utility of land in the steep-slope areas of Virginia. Congress, however, made contrary findings, and it is sufficient for purposes of judicial review that Congress had a rational basis for concluding as it did. See *Kleppe* v. *New Mexico,* 426 U. S. 529, 541, n. 10 (1976); *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152–154 (1938).

the "rational basis" test should not apply in this case because the Act regulates land use, a local activity not affecting interstate commerce. But even assuming that appellees correctly characterize the land use regulated by the Act as a "local" activity, their argument is unpersuasive.

The denomination of an activity as a "local" or "intrastate" activity does not resolve the question whether Congress may regulate it under the Commerce Clause. As previously noted, the commerce power "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States* v. *Wrightwood Dairy Co.,* 315 U. S., at 119. See *Fry* v. *United States,* 421 U. S., at 547; *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S., at 37. This Court has long held that Congress may regulate the conditions under which goods shipped in interstate commerce are produced where the "local" activity of producing these goods itself affects interstate commerce. See, *e. g., United States* v. *Darby,* 312 U. S. 100 (1941); *Wickard* v. *Filburn,* 317 U. S. 111 (1942); *NLRB* v. *Jones & Laughlin Steel Corp., supra; Kirschbaum Co.* v. *Walling,* 316 U. S. 517 (1942). Cf. *Katzenbach* v. *McClung,* 379 U. S. 294 (1964). Appellees do not dispute that coal is a commodity that moves in interstate commerce. Here, Congress rationally determined that regulation of surface coal mining is necessary to protect interstate commerce from adverse effects that may result from that activity. This congressional finding is sufficient to sustain the Act as a valid exercise of Congress' power under the Commerce Clause.

Moreover, the Act responds to a congressional finding that nationwide "surface mining and reclamation standards are essential in order to insure that competition in interstate commerce among sellers of coal produced in different States will not be used to undermine the ability of the several States

to improve and maintain adequate standards on coal mining operations within their borders." 30 U. S. C. § 1201 (g) (1976 ed., Supp. III). The prevention of this sort of destructive interstate competition is a traditional role for congressional action under the Commerce Clause. In *United States v. Darby, supra,* the Court used a similar rationale to sustain the imposition of federal minimum wage and maximum hour regulations on a manufacturer of goods shipped in interstate commerce. The Court explained that the statute implemented Congress' view that "interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce and to the states from and to which the commerce flows." *Id.,* at 115. The same rationale applies here to support the conclusion that the Surface Mining Act is within the authority granted to Congress by the Commerce Clause.

Finally, we agree with the lower federal courts that have uniformly found the power conferred by the Commerce Clause broad enough to permit congressional regulation of activities causing air or water pollution, or other environmental hazards that may have effects in more than one State.[21] Appellees do not dispute that the environmental and other problems that the Act attempts to control can properly be addressed through Commerce Clause legislation. In these circumstances, it is difficult to find any remaining foundation

---

[21] See, *e. g., United States v. Byrd,* 609 F. 2d 1204, 1209–1210 (CA7 1979); *Bethlehem Steel Corp. v. Train,* 544 F. 2d 657, 663 (CA3 1976); *Sierra Club v. EPA,* 176 U. S. App. D. C. 335, 360, 540 F. 2d 1114, 1139 (1976), cert. denied, 430 U. S. 959 (1977); *District of Columbia v. Train,* 172 U. S. App. D. C. 311, 328, 521 F. 2d 971, 988 (1975), vacated and remanded on other grounds *sub nom. EPA v. Brown,* 431 U. S. 99 (1977); *United States v. Ashland Oil & Transportation Co.,* 504 F. 2d 1317, 1325 (CA6 1974); *Pennsylvania v. EPA,* 500 F. 2d 246, 259 (CA3 1974); *South Terminal Corp. v. EPA,* 504 F. 2d 646, 677 (CA1 1974); *United States v. Bishop Processing Co.,* 287 F. Supp. 624 (Md. 1968), aff'd, 423 F. 2d 469 (CA4), cert. denied, 398 U. S. 904 (1970).

for appellees' argument that, because it regulates a particular land use, the Surface Mining Act is beyond congressional Commerce Clause authority. Accordingly, we turn to the question whether the means selected by Congress were reasonable and appropriate.

Appellees' essential challenge to the means selected by the Act is that they are redundant or unnecessary. Appellees contend that a variety of federal statutes such as the Clean Air Act, 42 U. S. C. § 7401 *et seq.* (1976 ed., Supp. III), the Flood Control Acts, 33 U. S. C. § 701 *et seq.* (1976 ed., Supp. III), and the Clean Water Act, 33 U. S. C. § 1251 *et seq.* (1976 ed., Supp. III), adequately address the federal interest in controlling the environmental effects of surface coal mining without need to resort to the land-use regulation scheme of the Surface Mining Act. The short answer to this argument is that the effectiveness of existing laws in dealing with a problem identified by Congress is ordinarily a matter committed to legislative judgment. Congress considered the effectiveness of existing legislation and concluded that additional measures were necessary to deal with the interstate commerce effects of surface coal mining. See H. R. Rep. No. 95–218, at 58–60; S. Rep. No. 95–128, at 59–63. And we agree with the court below that the Act's regulatory scheme is reasonably related to the goals Congress sought to accomplish. The Act's restrictions on the practices of mine operators all serve to control the environmental and other adverse effects of surface coal mining.

In sum, we conclude that the District Court properly rejected appellees' Commerce Clause challenge to the Act. We therefore turn to the court's ruling that the Act contravenes affirmative constitutional limitations on congressional exercise of the commerce power.

### III

The District Court invalidated §§ 515 (d) and (e) of the Act, which prescribe performance standards for surface coal

mining on "steep slopes," [22] on the ground that they violate a constitutional limitation on the commerce power imposed by the Tenth Amendment. These provisions require "steep-slope" operators: (i) to reclaim the mined area by completely covering the highwall and returning the site to its "approximate original contour"; [23] (ii) to refrain from dumping spoil material on the downslope below the bench or mining cut; and (iii) to refrain from disturbing land above the highwall unless permitted to do so by the regulatory authority. § 515 (d), 30 U. S. C. § 1265 (d) (1976 ed., Supp. III). Under § 515 (e), a "steep-slope" operator may obtain a variance from the approximate-original-contour requirement by showing that it will allow a postreclamation use that is "deemed to constitute an equal or better economic or public use" than would otherwise be possible. 30 U. S. C. § 1265 (e)(3)(A) (1976 ed., Supp. III).[24]

The District Court's ruling relied heavily on our decision in *National League of Cities* v. *Usery,* 426 U. S. 833 (1976). The District Court viewed the central issue as whether the Act governs the activities of private individuals, or whether it instead regulates the governmental decisions of the States. And although the court acknowledged that the Act "ultimately affects the coal mine operator," 483 F. Supp., at 432, it concluded that the Act contravenes the Tenth Amendment

---

[22] Section 515 (d)(4), 30 U. S. C. § 1265 (d)(4) (1976 ed., Supp. III), defines a "steep slope" as "any slope above twenty degrees or such lesser slope as may be defined by the regulatory authority after consideration of soil, climate, and other characteristics of a region or State."

[23] The term "approximate original contour" is defined as "that surface configuration achieved by backfilling and grading of the mined area so that the reclaimed area, including any terracing or access roads, closely resembles the general surface configuration of the land prior to mining and blends into and complements the drainage pattern of the surrounding terrain, with all highwalls and spoil piles eliminated." § 701 (2), 30 U. S. C. § 1291 (2) (1976 ed., Supp. III).

[24] Section 515 (c), 30 U. S. C. § 1265 (c) (1976 ed., Supp. III), establishes a separate variance procedure for mountaintop mining operations.

because it interferes with the States' "traditional governmental function" of regulating land use. *Id.*, at 435. The court held that, as applied to Virginia, the Act's steep-slope provisions impermissibly constrict the State's ability to make "essential decisions."[25] The court found the Act accomplishes this result "through forced relinquishment of state control of land use planning; through loss of state control of its economy; and through economic harm, from expenditure of state funds to implement the act and from destruction of the taxing power of certain counties, cities, and towns." *Id.*, at 435.[26] The court therefore permanently enjoined enforcement of §§ 515 (d) and (e).[27]

---

[25] The court reasoned that although the Act allows a State to elect to have its own regulatory program, the "choice that is purportedly given is no choice at all" because the state program must comply with federally prescribed standards. 483 F. Supp., at 432.

[26] On the basis of the evidence presented at trial, the court found that postmining restoration of steep slopes to their "approximate original contour" is "economically infeasible and physically impossible." *Id.*, at 434. The court noted that the steep-slope provisions particularly affect Virginia because 95% of its coal reserves are located on such lands. And the court indicated that several coal mine operators had been forced to shut down because they were unable to comply with the Act's requirements, with adverse consequences for the economies of various towns and counties that are dependent on coal mining. The court also found that there is a need for level land in the counties of the Virginia coal fields, and it concluded that the Act's reclamation provisions would prevent "forward-looking land use planning" by the State. *Ibid.* Finally, the court found that restoration of mined land to its original contour would diminish the value of the land from the $5,000–$300,000-an-acre value of level land to the $5–$75-per-acre value of steep-slope land.

[27] In its order and opinion accompanying its denial of the Secretary's request for a stay of its judgment pending appeal, see n. 13, *supra*, the District Court explained that the injunction against enforcement of the steep-slope standards was not intended to "allo[w] spoil to be placed on the downslope in an uncontrolled manner." The court stated that "[a]ny such downslope spoil placement shall be in a controlled manner meeting environmental protection standards specified by the regulatory authority." J. S. App. 2a.

The District Court's reliance on *National League of Cities* requires a careful review of the actual basis and import of our decision in that case. There, we considered a constitutional challenge to the 1974 amendments to the Fair Labor Standards Act which had extended federal minimum wage and maximum hour regulations to most state and local government employees. Because it was conceded that the challenged regulations were "undoubtedly within the scope of the Commerce Clause," 426 U. S., at 841, the only question presented was whether that particular exercise of the commerce power "encounter[ed] a . . . constitutional barrier because [the regulations] applied directly to the States and subdivisions of States as employers." *Ibid.* We began by drawing a sharp distinction between congressional regulation of private persons and businesses "necessarily subject to the dual sovereignty of the government of the Nation and of the State in which they reside," *id.,* at 845, and federal regulation "directed, not to private citizens, but to the States as States," *ibid.* As to the former, we found no Tenth Amendment impediment to congressional action. Instead, we reaffirmed our consistent rule:

> "Congressional power over areas of private endeavor, even when its exercise may pre-empt express state-law determinations contrary to the result that has commended itself to the collective wisdom of Congress, has been held to be limited only by the requirement that 'the means chosen by [Congress] must be reasonably adapted to the end permitted by the Constitution.' *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 262 (1964)." *Id.,* at 840.

The Court noted, however, that "the States as States stand on a quite different footing from an individual or corporation when challenging the exercise of Congress' power to regulate commerce." *Id.,* at 854. It indicated that when Congress attempts to directly regulate the States as States the Tenth

Amendment requires recognition that "there are attributes of sovereignty attaching to every state government which may not be impaired by Congress, not because Congress may lack an affirmative grant of legislative authority to reach the matter, but because the Constitution prohibits it from exercising the authority in that manner." *Id.*, at 845. The Court held that the power to set the wages and work hours of state employees was "an undoubted attribute of state sovereignty." *Ibid.* And because it further found that the challenged regulations would "displace the States' freedom to structure integral operations in areas of traditional governmental functions," *id.*, at 852, the Court concluded that Congress could not, consistently with the Tenth Amendment, "abrogate the States' otherwise plenary authority to make [these decisions]." *Id.*, at 846.[28]

It should be apparent from this discussion that in order to succeed, a claim that congressional commerce power legislation is invalid under the reasoning of *National League of Cities* must satisfy *each* of three requirements. First, there must be a showing that the challenged statute regulates the "States as States." *Id.*, at 854. Second, the federal regula-

---

[28] *National League of Cities* expressly left open the question "whether different results might obtain if Congress seeks to affect integral operations of state governments by exercising authority granted it under other sections of the Constitution such as the spending power, Art. I, § 8, cl. 1, or § 5 of the Fourteenth Amendment." 426 U. S., at 852, n. 17. In *Fitzpatrick* v. *Bitzer*, 427 U. S. 445 (1976), the Court upheld Congress' power under § 5 of the Fourteenth Amendment to authorize private damages actions against state governments for discrimination in employment. The Court explained that because the Amendment was adopted with the specific purpose of limiting state autonomy, constitutional principles of federalism do not restrict congressional power to invade state autonomy when Congress legislates under § 5 of the Fourteenth Amendment. *Id.*, at 452–456. Similarly, in *City of Rome* v. *United States*, 446 U. S. 156, 179 (1980), we held that the Tenth Amendment places no restrictions on congressional power "to enforce the Civil War Amendments 'by appropriate legislation.'"

tion must address matters that are indisputably "attribute[s] of state sovereignty." *Id.*, at 845. And third, it must be apparent that the States' compliance with the federal law would directly impair their ability "to structure integral operations in areas of traditional governmental functions." *Id.*, at 852.[29] When the Surface Mining Act is examined in light of these principles, it is clear that appellees' Tenth Amendment challenge must fail because the first of the three requirements is not satisfied. The District Court's holding to the contrary rests on an unwarranted extension of the decision in *National League of Cities.*

As the District Court itself acknowledged, the steep-slope provisions of the Surface Mining Act govern only the activities of coal mine operators who are private individuals and businesses. Moreover, the States are not compelled to enforce the steep-slope standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever. If a State does not wish to submit a proposed permanent program that complies with the Act and implementing regulations, the full regulatory burden will be borne by the Federal Government. Thus, there can be no suggestion that the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program. Cf. *Maryland* v. *EPA,* 530 F. 2d 215, 224–228 (CA4 1975), vacated and remanded *sub nom. EPA* v. *Brown,* 431 U. S. 99 (1977); *District of Columbia* v. *Train,* 172 U. S. App. D. C. 311, 330–334, 521 F. 2d 971, 990–994 (1975), vacated and remanded *sub nom. EPA* v. *Brown,* 431 U. S. 99 (1977); *Brown* v. *EPA,* 521 F.

---

[29] Demonstrating that these three requirements are met does not, however, guarantee that a Tenth Amendment challenge to congressional commerce power action will succeed. There are situations in which the nature of the federal interest advanced may be such that it justifies state submission. See *Fry* v. *United States,* 421 U. S. 542 (1975), reaffirmed in *National League of Cities* v. *Usery,* 426 U. S., at 852–853. See also *id.*, at 856 (BLACKMUN, J., concurring).

2d 827, 837–842 (CA9 1975), vacated and remanded, 431 U. S. 99 (1977). The most that can be said is that the Surface Mining Act establishes a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs. See *In re Permanent Surface Mining Regulation Litigation,* 199 U. S. App. D. C. 225, 226, 617 F. 2d 807, 808 (1980). In this respect, the Act resembles a number of other federal statutes that have survived Tenth Amendment challenges in the lower federal courts.[30]

Appellees argue, however, that the threat of federal usurpation of their regulatory roles coerces the States into enforcing the Surface Mining Act. Appellees also contend that the Act directly regulates the States as States because it establishes mandatory minimum federal standards. In essence, appellees urge us to join the District Court in looking beyond the activities actually regulated by the Act to its conceivable effects on the States' freedom to make decisions in areas of "integral governmental functions." And appellees emphasize, as did the court below, that the Act interferes with the States' ability to exercise their police powers by regulating land use.

Appellees' claims accurately characterize the Act insofar as it prescribes federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federally administered regulatory program. To object to this scheme, however, appellees must assume that the Tenth Amendment limits congressional power to

---

[30] See, *e. g., United States* v. *Helsley,* 615 F. 2d 784 (CA9 1979) (upholding the Airborne Hunting Act, 16 U. S. C. § 742j–1); *Friends of the Earth, Inc.* v. *Carey,* 552 F. 2d 25, 36–39 (CA2) (upholding the Clean Air Act, 42 U. S. C. § 7401 *et seq.* (1976 ed., Supp. III)), cert. denied, 434 U. S. 902 (1977); *Sierra Club* v. *EPA,* 176 U. S. App. D. C. 335, 359, 540 F. 2d 1114, 1140 (1976) (upholding the Clean Water Act, 33 U. S. C. § 1251 *et seq.*), cert. denied, 430 U. S. 959 (1977).

pre-empt or displace state regulation of private activities affecting interstate commerce. This assumption is incorrect.

A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law. See, *e. g., Jones v. Rath Packing Co.,* 430 U. S. 519, 525–526 (1977); *Perez v. Campbell,* 402 U. S. 637, 649–650 (1971); *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U. S. 132, 141–143 (1963); *Bethlehem Steel Co. v. New York State Labor Relations Bd.,* 330 U. S. 767, 772–776 (1947); *Hines v. Davidowitz,* 312 U. S. 52, 67–68 (1941). Moreover, it is clear that the Commerce Clause empowers Congress to prohibit all—and not just inconsistent—state regulation of such activities. See, *e. g., City of Burbank v. Lockheed Air Terminal, Inc.,* 411 U. S. 624 (1973); *Campbell v. Hussey,* 368 U. S. 297 (1961); *Rice v. Santa Fe Elevator Corp.,* 331 U. S. 218 (1947); *Transit Comm'n v. United States,* 289 U. S. 121 (1933). Although such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result. See *Chicago & North Western Transp. Co. v. Kalo Brick & Tile Co.,* 450 U. S. 311, 317–319 (1981); *Sanitary District v. United States,* 266 U. S. 405, 425–426 (1925); *The Minnesota Rate Cases,* 230 U. S. 352, 399 (1913); *Gibbons v. Ogden,* 9 Wheat., at 211. As the Court long ago stated: "It is elementary and well settled that there can be no divided authority over interstate commerce, and that the acts of Congress on that subject are supreme and exclusive." *Missouri Pacific R. Co. v. Stroud,* 267 U. S. 404, 408 (1925).

Thus, Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role. Contrary to the assumption by both the District Court and appellees, nothing in

*National League of Cities* suggests that the Tenth Amendment shields the States from pre-emptive federal regulation of *private* activities affecting interstate commerce. To the contrary, *National League of Cities* explicitly reaffirmed the teaching of earlier cases that Congress may, in regulating private activities pursuant to the commerce power, "pre-empt express state-law determinations contrary to the result which has commended itself to the collective wisdom of Congress . . . ." 426 U. S., at 840. The only limitation on congressional authority in this regard is the requirement that the means selected be reasonably related to the goal of regulating interstate commerce. *Ibid.* We have already indicated that the Act satisfies this test.[31]

This conclusion applies regardless of whether the federal legislation displaces laws enacted under the States' "police powers." The Court long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause in a manner that displaces the States' exercise of their police powers. See *Hoke* v. *United States,* 227 U. S. 308, 320–323 (1913); *Athanasaw* v. *United States,* 227 U. S. 326 (1913); *Cleveland* v. *United States,* 329 U. S., at 19; *United States* v. *Darby,* 312 U. S., at 113–114; *United States* v. *Wrightwood Dairy Co.,* 315 U. S., at 119. Cf. *United States* v. *Carolene Products Co.,* 304 U. S. 144, 147 (1938) ("it is no objection to the exertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states"); [32] accord, *FPC* v. *Natural Gas Pipeline Co.,* 315

[31] See *supra,* at 283. It is significant that the Commonwealth of Virginia presses its Tenth Amendment challenge to the Act simply as another regulator of surface coal mining whose regulatory program has been displaced or pre-empted by federal law. As indicated in text, there are no Tenth Amendment concerns in such situations.

[32] This holding disposes of the contention by appellees and various *amici* that the Surface Mining Act is unconstitutional because it pre-

U. S. 575, 582 (1942); *Hamilton* v. *Kentucky Distilleries & Warehouse Co.*, 251 U. S. 146, 156 (1919); *Seven Cases* v. *United States*, 239 U. S. 510, 514 (1916). This Court has upheld as constitutional any number of federal statutes enacted under the commerce power that pre-empt particular exercises of state police power. See, *e. g.*, *United States* v. *Walsh*, 331 U. S. 432 (1947) (upholding Federal Food, Drug, and Cosmetic Act, 21 U. S. C. §§ 301–392); *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1 (1937) (upholding National Labor Relations Act, 29 U. S. C. §§ 151–168); *United States* v. *Darby, supra* (upholding Fair Labor Standards Act, 29 U. S. C. §§ 201–219). It would therefore be a radical departure from long-established precedent for this Court to hold that the Tenth Amendment prohibits Congress from displacing state police power laws regulating private activity. Nothing in *National League of Cities* compels or even hints at such a departure.[33]

---

sumes the existence of a federal police power. As the Court has stated: " 'The authority of the federal government over interstate commerce does not differ in extent or character from that retained by the states over intrastate commerce.' " *United States* v. *Darby*, 312 U. S., at 116, quoting *United States* v. *Rock Royal Co-operative*, 307 U. S. 533, 569–570 (1939).

[33] The remaining justification asserted by the District Court for its Tenth Amendment ruling, one that appellees urge here, is that the steep-slope mining requirements will harm Virginia's economy and destroy the taxing power of some towns and counties in the Commonwealth. In this regard, the court may have been influenced by the discussion in *National League of Cities* about the likely effects of the challenged regulations on the finances of state and local governments. *National League of Cities* v. *Usery*, 426 U. S., at 846–847. But as the Court made clear, the determinative factor in that case was the nature of the federal action, not the ultimate economic impact on the States. *Id.*, at 847. Moreover, even if it is true that the Act's requirements will have a measurable impact on Virginia's economy, this kind of effect, standing alone, is insufficient to establish a violation of the Tenth Amendment. In *Oklahoma* v. *Atkinson Co.*, 313 U. S. 508, 534–535 (1941), the Court rejected the assertion that an adverse impact on state and local economies is a barrier to Congress'

In sum, appellees' Tenth Amendment challenge to the Surface Mining Act must fail because here, in contrast to the situation in *National League of Cities,* the statute at issue regulates only "individual businesses necessarily subject to the dual sovereignty of the government of the Nation and the State in which they reside." *National League of Cities v. Usery,* 426 U. S., at 845.[34] Accordingly, we turn to the District Court's ruling that the Act contravenes other constitutional limits on congressional action.

## IV

The District Court held that two of the Act's provisions violate the Just Compensation Clause of the Fifth Amendment. First, the court found that the steep-slope provisions discussed above effect an uncompensated taking of private property by requiring operators to perform the "economically and physically impossible" task of restoring steep-slope surface mines to their approximate original contour. 483 F. Supp., at 437.[35] The court further held that, even if steep-slope surface mines could be restored to their approximate original contour, the value of the mined land after such restoration would have "been diminished to practically noth-

---

exercise of its power under the Commerce Clause to regulate private activities affecting interstate commerce. We are not persuaded that there are compelling reasons presented in the instant cases for reversing the Court's position.

[34] We have assumed that the District Court correctly held that land-use regulation is an "integral governmental function" as that term was used in *National League of Cities.* Our resolution of the Tenth Amendment challenge to the Act makes it unnecessary for us to decide whether this is actually the case.

[35] The District Court acknowledged the existence of a statutory procedure for requesting variances from the steep-slope provisions. But the court suggested that the statutory requirement that highwalls of reclaimed mining cuts be completely covered makes this variance procedure "meaningless" to steep-slope mine operators. 483 F. Supp., at 437. This conclusion was premature. See n. 39, *infra.*

ing." *Ibid.* Second, the court found that § 522 of the Act effects an unconstitutional taking because it expressly prohibits mining in certain locations and "clearly prevent[s] a person from mining his own land or having it mined." *Id.,* at 441.[36] Relying on this Court's decision in *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393 (1922), the District Court held that both of these provisions are unconstitutional because they "depriv[e] [coal mine operators] of any use of [their] land, not only the most profitable . . . ." 483 F. Supp., at 441.

We conclude that the District Court's ruling on the "taking" issue suffers from a fatal deficiency: neither appellees nor the court identified any property in which appellees have an interest that has allegedly been taken by operation of the Act. By proceeding in this fashion, the court below ignored this Court's oft-repeated admonition that the constitutionality of statutes ought not be decided except in an actual

---

[36] With certain specified exceptions, and subject to "valid existing rights," § 522 (e) prohibits surface mining operations in national parks and forests, or where they will adversely affect publicly owned parks or places that are included in the National Register of Historic Sites. 30 U. S. C. §§ 1272 (e) (1), (2), and (3) (1976 ed., Supp. III). It also prohibits surface mining within 100 feet of a cemetery or the right-of-way of a public road, and within 300 feet of an occupied dwelling, public building, school, church, community or institutional building, or public park. §§ 522 (e) (4) and (5).

Sections 522 (a), (c), and (d), which become applicable during the permanent phase of the regulatory program, require the establishment of procedures for designating particular lands as unsuitable for some or all surface mining. 30 U. S. C. §§ 1272 (a), (c), and (d) (1976 ed., Supp. III). The District Court's ruling that these latter provisions effect an unconstitutional taking of private property is puzzling and cannot stand. Since these provisions do not come into effect until the permanent phase of the Act's regulatory program, they have not been applied to appellees or any other private landowner in Virginia. In these circumstances, there was no justiciable case or controversy with regard to these sections of the Act. See *United Public Workers* v. *Mitchell,* 330 U. S. 75, 89–91 (1947).

factual setting that makes such a decision necessary. See *Socialist Labor Party* v. *Gilligan,* 406 U. S. 583, 588 (1972); *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–575, 584 (1947); *Alabama State Federation of Labor* v. *McAdory,* 325 U. S. 450, 461 (1945). Adherence to this rule is particularly important in cases raising allegations of an unconstitutional taking of private property. Just last Term, we reaffirmed that

> "this Court has generally 'been unable to develop any "set formula" for determining when "justice and fairness" require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons.' Rather, it has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance." *Kaiser Aetna* v. *United States,* 444 U. S. 164, 175 (1979) (citations omitted).

These "ad hoc, factual inquiries" must be conducted with respect to specific property, and the particular estimates of economic impact and ultimate valuation relevant in the unique circumstances.

Because appellees' taking claim arose in the context of a facial challenge, it presented no concrete controversy concerning either application of the Act to particular surface mining operations or its effect on specific parcels of land. Thus, the only issue properly before the District Court and, in turn, this Court, is whether the "mere enactment" of the Surface Mining Act constitutes a taking. See *Agins* v. *Tiburon,* 447 U. S. 255, 260 (1980). The test to be applied in considering this facial challenge is fairly straightforward. A

statute regulating the uses that can be made of property effects a taking if it "denies an owner economically viable use of his land . . . ." *Agins* v. *Tiburon, supra,* at 260. See *Penn Central Transp. Co.* v. *New York City,* 438 U. S. 104 (1978). The Surface Mining Act easily survives scrutiny under this test.

First, the Act does not, on its face, prevent beneficial use of coal-bearing lands. Except for the proscription of mining near certain locations by § 522 (e), the Act does not categorically prohibit surface coal mining; it merely regulates the conditions under which such operations may be conducted.[37] The Act does not purport to regulate alternative uses to which coal-bearing lands may be put.[38] Thus, in the posture in

---

[37] Although § 522 (e) prohibits any surface coal mining in certain areas, appellees' "taking" challenge to this provision is premature. First, appellees made no showing in the District Court that they own tracts of land that are affected by this provision. Second, § 522 (e) does not, on its face, deprive owners of land within its reach of economically viable use of their land since it does not proscribe nonmining uses of such land. Third, § 522 (e)'s restrictions are expressly made subject to "valid existing rights." Appellees contend that this exception "applies only to specific surface mining operations for which all required permits were issued prior to August 3, 1977, the effective date of the Act." Brief for Virginia Surface Mining Reclamation Association, Inc., et al. 48. This interpretation of the exception is not compelled by either the statutory language or its legislative history. See H. R. Rep. No. 95–218, p. 95 (1977). It is apparently based on 30 CFR § 761.5 (a)(2)(i) (1980), a regulation promulgated by the Secretary. That regulation, however, was remanded to the Secretary for reconsideration by the United States District Court for the District of Columbia. *In re Permanent Surface Mining Regulation Litigation,* 14 ERC 1083, 1091 (1980), appeals pending, No. 80–1810 et al. (CADC). The Secretary did not ask the Court of Appeals to review this portion of the District Court's judgment.

[38] If, as the District Court found, level land in the steep-slope areas of Virginia is worth $5,000–$300,000 per acre, some landowners presumably retain the option of simply leveling the land without first mining the coal. Moreover, if flat benchland is truly as valuable as the court below found, there should be no financial impediment to the re-establishment of flat

which these cases come before us, there is no reason to suppose that "mere enactment" of the Surface Mining Act has deprived appellees of economically viable use of their property.

Moreover, appellees cannot at this juncture legitimately raise complaints in this Court about the manner in which the challenged provisions of the Act have been or will be applied in specific circumstances, or about their effect on particular coal mining operations. There is no indication in the record that appellees have availed themselves of the opportunities provided by the Act to obtain administrative relief by requesting either a variance from the approximate-original-contour requirement of § 515 (d) or a waiver from the surface mining restrictions in § 522 (e). If appellees were to seek administrative relief under these procedures, a mutually acceptable solution might well be reached with regard to individual properties, thereby obviating any need to address the constitutional questions.[39] The potential for such administrative solutions confirms the conclusion that the taking issue decided by the District Court simply is not ripe for judicial resolution.[40]

---

areas on the sites of some old mining operations, once those areas have been restored and stabilized in the manner required by the Act.

[39] The District Court's conclusion that the steep-slope variance procedure in § 515 (e) does not offer a meaningful opportunity for administrative relief was premature. Appellees did not identify any instance in which the statutory obligation to cover the highwall had prevented a mine operator from taking advantage of the variance procedure.

[40] Although we conclude that "mere enactment" of the Act did not effect a taking of private property, this holding does not preclude appellees or other coal mine operators from attempting to show that as applied to particular parcels of land, the Act and the Secretary's regulations effect a taking. Even then, such an alleged taking is not unconstitutional unless just compensation is unavailable. See *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 94, n. 39 (1978); *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 125–136 (1974); *Larson* v. *Domestic & Foreign Commerce Corp.*, 337 U. S. 682, 697, n. 18 (1949).

# V

## A

The District Court next ruled that the Act contravenes the Fifth Amendment because a number of its enforcement provisions offend the Amendment's Due Process Clause. One such provision is § 521 (a)(2), 30 U. S. C. § 1271 (a)(2) (1976 ed., Supp. III), which instructs the Secretary immediately to order total or partial cessation of a surface mining operation whenever he determines, on the basis of a federal inspection, that the operation is in violation of the Act or a permit condition required by the Act and that the operation

> "creates an immediate danger to the health or safety of the public, or is causing, or can reasonably be expected to cause significant, imminent environmental harm to land, air, or water resources . . . ." [41]

A mine operator aggrieved by an immediate cessation order issued under § 521 (a)(2) or by a cessation order issued after a notice of violation and expiration of an abatement period under § 521 (a)(3) may immediately request temporary relief from the Secretary, and the Secretary must respond to the request within five days of its receipt. § 525 (c), 30 U. S. C. § 1275 (1976 ed., Supp. III). Section 526 (c) of the Act, 30 U. S. C. § 1276 (c) (1976 ed., Supp. III), authorizes judicial review of a decision by the Secretary denying temporary relief. In addition, cessation orders are subject to informal administrative review under § 521 (a)(5), and formal administrative review, including an adjudicatory hearing, under § 525 (b), 30 U. S. C. § 1275 (b) (1976 ed., Supp.

---

[41] Where the Secretary determines that a violation of the Act or of a permit condition does not entail such a serious threat, he must issue a notice of violation fixing a reasonable time for abatement. § 521 (a)(3), 30 U. S. C. § 1271 (a)(3) (1976 ed., Supp. III). If the violation is not abated within the prescribed period, the Secretary must immediately order total or partial cessation of the offending mining operation.

III).[42] The Secretary's decision in the formal review proceeding is subject to judicial review pursuant to § 526 (a)(2), 30 U. S. C. § 1276 (a)(2) (1976 ed., Supp. III).

The District Court held that § 521 (a)(2)'s authorization of immediate cessation orders violates the Fifth Amendment because the statute does not provide sufficiently objective criteria for summary administrative action. In this regard, the court relied on its finding that OSM inspectors had issued against a particular company three immediate cessation orders which were later overturned on appeal, and that the company involved had suffered significant losses. The court enjoined the Secretary from issuing any immediate cessation orders "until such time as Congress makes provisions to correct the use of subjective criteria by OSM inspectors." 483 F. Supp., at 448.[43] In addition, the court ruled that even if the Act is amended to correct this problem, the 5-day response period prescribed by the Act does not meet the requirements of due process. Instead, the court held that the Secretary must respond within 24 hours to a mine operator's request for temporary relief from an immediate cessation order. We find both aspects of the District Court's reasoning unpersuasive.

Our cases have indicated that due process ordinarily requires an opportunity for "some kind of hearing" prior to the deprivation of a significant property interest. See *Parratt* v. *Taylor,* 451 U. S. 527, 540 (1981); *Boddie* v. *Connecticut,* 401 U. S. 371, 379 (1971). The Court has often acknowl-

---

[42] Under § 521 (a)(5), 30 U. S. C. § 1271 (a)(5) (1976 ed., Supp. III), cessation orders automatically expire after 30 days, "unless a public hearing is held at the site or within such reasonable proximity to the site that any viewings of the site can be conducted during the course of the public hearing."

[43] The District Court's January 21, 1980, supplemental order and opinion, see n. 13, *supra,* explained that its injunction did not apply to immediate cessation orders issued pursuant to § 521 (a)(3) against mine operators who had failed to abate violations within the time period specified in the notice of violation. J. S. App. 2a–3a.

edged, however, that summary administrative action may be justified in emergency situations. See, *e. g., Calero-Toledo* v. *Pearson Yacht Leasing Co.,* 416 U. S. 663, 677–680 (1974); *Boddie* v. *Connecticut, supra,* at 378–379; *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S. 594, 599–600 (1950); *Fahey* v. *Mallonee,* 332 U. S. 245, 253–254 (1947); *Yakus* v. *United States,* 321 U. S. 414, 442–443 (1944); *Bowles* v. *Willingham,* 321 U. S. 503, 519–520 (1944); *Phillips* v. *Commissioner,* 283 U. S. 589, 595–599 (1931); *North American Cold Storage Co.* v. *Chicago,* 211 U. S. 306, 315–321 (1908). The question then, is whether the issuance of immediate cessation orders under § 521 (a) falls under this emergency situation exception to the normal rule that due process requires a hearing prior to deprivation of a property right. We believe that it does.

The immediate cessation order provisions reflect Congress' concern about the devastating damage that may result from mining disasters.[44] They represent an attempt to reach an accommodation between the legitimate desire of mining companies to be heard before submitting to administrative regulation and the governmental interest in protecting the public health and safety and the environment from imminent danger. Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is "[o]ne of the oldest examples" of permissible summary action. *Ewing* v. *Mytinger & Casselberry, Inc., supra,* at 599. See *Mackey* v.

---

[44] The legislative history of § 521 (a) (2) indicates that Congress viewed the Secretary's power to issue immediate cessation orders as critical, and that the measure was primarily intended to avert the possible occurrence of such disasters as the Buffalo Creek flood. See H. R. Rep. No. 95–218, pp. 129–130 (1977); S. Rep. No. 95–128, pp. 90–91 (1977). The Buffalo Creek flood was caused by the sudden collapse of a coal mine waste impoundment dam in 1972 near Buffalo Creek, W. Va. The flood left 124 persons dead and rendered 4,000 persons homeless. See H. R. Rep. No. 94–1445, p. 19 (1976).

*Montrym,* 443 U. S. 1, 17–18 (1979); *id.,* at 21, n. 1, 25 (STEWART, J., dissenting); *North American Cold Storage Co.* v. *Chicago, supra,* at 315–316. Moreover, the administrative action provided through immediate cessation orders responds to situations in which swift action is necessary to protect the public health and safety. This is precisely the type of emergency situation in which this Court has found summary administrative action justified. See *Ewing* v. *Mytinger & Casselberry, Inc., supra; North American Cold Storage Co.* v. *Chicago, supra.*

Rather than taking issue with any of these principles, the District Court held that the Act does not establish sufficiently objective criteria governing the issuance of summary cessation orders. We disagree. In our judgment, the criteria established by the Act and the Secretary's implementing regulations are specific enough to control governmental action and reduce the risk of erroneous deprivation. Section 701 (8) of the Act, 30 U. S. C. § 1291 (8) (1976 ed., Supp. III), defines the threat of "imminent danger to the health and safety of the public" as the· existence of a condition or practice which could

> "[r]easonably be expected to cause substantial physical harm to persons outside the permit area before such condition, practice, or violation can be abated. A reasonable expectation of death or serious injury before abatement exists if a rational person, subjected to the same conditions or practices giving rise to the peril, would not expose himself or herself to the danger during the time necessary for abatement." [45]

---

[45] The Secretary's regulations define "a significant, imminent environmental harm" in the following terms:

"(a) An environmental harm is any adverse impact on land, air, or water resources, which resources include, but are not limited to, plant and animal life.

"(b) An environmental harm is imminent, if a condition, practice, or violation exists which—(1) Is causing such harm, or, (2) May reasonably

If anything, these standards are more specific than the criteria in other statutes authorizing summary administrative action that have been upheld against due process challenges. See, *e. g., Ewing* v. *Mytinger & Casselberry, Inc., supra,* at 595–596 (" 'dangerous to health . . . or would be in a material respect misleading to the injury or damage of the purchaser or consumer' "); *Fahey* v. *Mallonee, supra,* at 250–251, n. 1 ("is unsafe or unfit to manage a Federal savings and loan association" or "[i]s in imminent danger of becoming impaired"); *Air East, Inc.* v. *National Transportation Safety Board,* 512 F. 2d 1227, 1232 (CA3) (" 'emergency requiring immediate action . . . in respect to air safety in commerce' "), cert. denied, 423 U. S. 863 (1975).

The fact that OSM inspectors have issued immediate cessation orders that were later overturned on administrative appeal does not undermine the adequacy of the Act's criteria but instead demonstrates the efficacy of the review procedures. The relevant inquiry is not whether a cessation order should have been issued in a particular case, but whether the statutory procedure itself is incapable of affording due process. *Yakus* v. *United States,* 321 U. S., at 434–435. The possibility of administrative error inheres in any regulatory program; statutory programs authorizing emergency administrative action prior to a hearing are no exception.[46] As we

---

be expected to cause such harm at any time before the end of the reasonable abatement time that would be set under Section 521 (a)(3) of the Act.

"(c) An environmental harm is significant if that harm is appreciable and not immediately reparable." 30 CFR §§ 700.5 and 701.5 (1980).

[46] A different case might be presented if a pattern of abuse and arbitrary action were discernible from review of an agency's administration of a summary procedure. Although the District Court sought to characterize the OSM's record in issuing cessation orders in these terms, a showing that three cessation orders were overturned on administrative appeal is far from sufficient to establish a pattern of abuse and arbitrary action.

explained in *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S., at 599:

> "Discretion of any official action may be abused. Yet it is not a requirement of due process that there be judicial inquiry before discretion can be exercised. It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination."

Here, mine operators are afforded prompt and adequate post-deprivation administrative hearings and an opportunity for judicial review. We are satisfied that the Act's immediate cessation order provisions comport with the requirements of due process.

We also conclude that the District Court erred in reducing the statutorily prescribed time period for the Secretary's response to requests for temporary relief. In the first place, the 5-day period is a statutory maximum and there is no indication in the record that the Secretary has not responded or will not respond in less than five days. Second, appellees have not demonstrated that they have been adversely affected by the 5-day response period in a particular case or that it is generally unreasonable. In addition, no evidence was introduced to show that a shorter reply period is administratively feasible. In these circumstances, there simply is no basis for the District Court's decision to substitute a judicial policy preference for the scheme adopted by Congress. Cf. *Vermont Yankee Nuclear Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U. S. 519 (1978). Accordingly, we turn to the District Court's holding that other sections of the Act violate the Fifth Amendment's Due Process Clause.

## B

The District Court ruled that the Act's civil penalty provisions do not comport with the requirements of due process. Under these provisions, the Secretary is to notify the recipient of a notice of violation or a cessation order of the pro-

posed amount of any civil penalty that is to be assessed against it. § 518 (c), 30 U. S. C. § 1268 (c) (1976 ed., Supp. III). Section 518 (c) further states that, if the operator "wishes to contest either the amount of the penalty or the fact of the violation," it must "forward the proposed amount to the Secretary for placement in an escrow account." [47] Once the escrow requirement is met, the operator receives a full adjudicatory hearing before an administrative law judge, with a right of appeal to an administrative board and judicial review of the final decision. See 30 U. S. C. § 1276 (a) (2) (1976 ed., Supp. III). If, after administrative or judicial review, it is determined that no violation occurred or that the amount of the proposed penalty should be reduced, the appropriate amount must promptly be refunded to the operator with interest. 30 U. S. C. § 1268 (c) (1976 ed., Supp. III).

In challenging the Act's civil penalty provisions appellees did not allege that they, or any one of them, have had civil penalties assessed against them. Moreover, the District Court did not find, as it did in ruling on the immediate cessation order provisions, that any of appellee coal mine operators have been affected or harmed by any of the statutory procedures for the assessment and collection of fines. Thus, the record in these cases belies any suggestion that there is a concrete case or controversy concerning the operation of these provisions. In these circumstances, we must conclude that appellees' challenge is premature, and that it was improper for the court below to render a decision on this claim.

## VI

Our examination of appellees' constitutional challenges to the Surface Mining Act persuades us that the Act is not

---

[47] However, no penalties are finally imposed until the alleged offender has been provided an opportunity for a public hearing. Section 518 (b) provides: "A civil penalty shall be assessed by the Secretary only after the person charged with a violation . . . has been given an opportunity for a public hearing." 30 U. S. C. § 1268 (b) (1976 ed., Supp. III).

vulnerable to their pre-enforcement challenge. Accordingly, we affirm the judgment of the District Court upholding the Act against appellees' Commerce Clause attack (No. 79–1596), and we reverse the judgment below insofar as it held various provisions of the Act unconstitutional (No. 79–1538). The cases are remanded to the District Court with instructions to dissolve the injunction issued against the Secretary, and for further proceedings consistent with this opinion.

*So ordered.*

THE CHIEF JUSTICE, concurring.*

I agree largely with what JUSTICE REHNQUIST has said about the "fictions" concerning delegation, and the gradual case-by-case expansion of the reach of the Commerce Clause.

I agree fully with his view that we often seem to forget the doctrine that laws enacted by Congress under the Commerce Clause must be based on a *substantial* effect on interstate commerce. However, I join the Court's opinions in these cases and in No. 80–231 because in them the Court acknowledges and reaffirms that doctrine. See, *e. g., ante,* at 280.

JUSTICE POWELL, concurring.

The Surface Mining Act mandates an extraordinarily intrusive program of federal regulation and control of land use and land reclamation, activities normally left to state and local governments. But the decisions of this Court over many years make clear that, under the Commerce Clause, Congress has the power to enact this legislation.

The Act could affect seriously the owners and lessees of the land and coal in the seven westernmost counties of Virginia. The Federal Government is required by the Fifth Amendment to pay just compensation for any "taking" of private

---

*[This opinion applies also to No. 80–231, *Hodel, Acting Secretary of the Interior, et al.* v. *Indiana et al., post,* p. 314.]

property for public use.[1] See *San Diego Gas & Electric Co.
v. City of San Diego,* 450 U. S. 621, 654 (1981) (BRENNAN,
J., dissenting).[2] But whether there has been such a "tak-
ing" and, if so, the amount of just compensation, are ques-
tions to be decided in specific cases. *Agins* v. *Tiburon,* 447
U. S. 255, 260 (1980); *Kaiser Aetna* v. *United States,* 444
U. S. 164, 175 (1979). I agree with the Court therefore, that
it is premature to consider in these cases questions under the
Compensation Clause. *Ante,* at 293–297. Appellees have
identified no specific property that is alleged to have been
taken. The Court's decision thus is confined to a holding
that the Act in this respect is not *facially* unconstitutional.
*Ante,* at 297, n. 40. The "taking" issue remains available to,
and may be litigated by, any owner or lessee whose property
interest is adversely affected by the enforcement of the Act.[3]

I add a word about the area of Virginia that will be af-
fected by this Act, as its location, topography, and geology
are highly relevant to an understanding of the "taking" ques-
tion. Bituminous coal, Virginia's most valuable natural re-
source,[4] is found in a region marked by steep mountain slopes,
sharp ridges, massive outcrops of rock, and narrow valleys—
conditions that severely limit alternative uses of the land.
Because of thin soil and rugged terrain, the land in its nat-
ural state is not suited for agricultural use or the growing
of merchantable timber. Its value lies, in most instances,

---

[1] We assume, of course, that Congress weighed this probable cost against
the desirable environmental goals of the Act.

[2] The "taking" question considered by JUSTICE BRENNAN and the three
Justices who joined him was not reached by a majority of the Court.

[3] In *Agins,* 447 U. S., at 260, we observed that the "determination that
government action constitutes a taking is, in essence, a determination that
the public at large, rather than a single owner, must bear the burden of an
exercise of state power in the public interest."

[4] The District Court found that the mining of coal is a $2 billion per
year industry in the Commonwealth.

solely in its coal. Mining the coal is a major industrial activity in an otherwise impoverished area of Virginia.[5]

A number of the Act's provisions appear to have been written with little comprehension of its potential effect on this rugged area. For example, the requirement in § 515 (d) that steep-slope areas be restored approximately to their original contours seems particularly unrealistic. As the District Court found, 95% of the strippable coal lands in Virginia are located on slopes in excess of 20 degrees. 483 F. Supp. 425, 434 (1980). The cost of restoration in some situations could exceed substantially the value of the coal. In any event restoring steep mountain slopes often would diminish rather than increase the land's worth.

In sum, if the Act is implemented broadly in accordance with its terms, the consequences to individual lessees and owners, and to the area as a whole, could be far-reaching. But adjudication of claims arising from such implementation is for the future. I agree with the Court that we cannot say that the Act is facially invalid, and I therefore join its opinion.

JUSTICE REHNQUIST, concurring in the judgment.*

It is illuminating for purposes of reflection, if not for argument, to note that one of the greatest "fictions" of our federal system is that the Congress exercises only those powers delegated to it, while the remainder are reserved to the States or to the people. The manner in which this Court has construed the Commerce Clause amply illustrates the extent of this fiction. Although it is clear that the people, through the States, *delegated* authority to Congress to "regulate Commerce . . . among the several States," U. S. Const., Art. I,

---

[5] It is said, perhaps frivolously now, that bootlegging was the second most remunerative activity in that part of the State.

*[This opinion applies also to No. 80–231, *Hodel, Acting Secretary of the Interior, et al.* v. *Indiana et al., post,* p. 314.]

§ 8, cl. 3, one could easily get the sense from this Court's opinions that the federal system exists only at the sufferance of Congress.

As interpreted by the Court, Congress' power under the Commerce Clause is broad indeed. The power has evolved through the years to include not simply the regulation of interstate commerce itself, as in *Gibbons* v. *Ogden,* 9 Wheat. 1 (1824), but also the power "to *exclude* from the commerce articles whose use in the states for which they are destined it may conceive to be injurious to the public health, morals or welfare, even though the state has not sought to regulate their use." *United States* v. *Darby,* 312 U. S. 100, 114 (1941). In the *Shreveport Rate Case,* 234 U. S. 342, 351 (1914), the Court upheld the action of Congress in regulating the rates of *intrastate* railroads, reasoning that the commerce power included the power to "control . . . all matters having such a close and substantial relation to interstate traffic . . . ." In *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937), the Court rejected the notion that certain kinds of activity were not in "commerce," such as manufacturing, cf. *United States* v. *E. C. Knight Co.,* 156 U. S. 1 (1895), and concluded that Congress may regulate labor relations in any manufacturing plant because a work stoppage at any such plant "would have a most serious effect upon interstate commerce." 301 U. S., at 41. And in *Wickard* v. *Filburn,* 317 U. S. 111 (1942), the Court expanded the scope of the Commerce Clause to include the regulation of acts which taken alone might not have a substantial economic effect on interstate commerce, such as a wheat farmer's own production, but which might reasonably be deemed nationally significant in their cumulative effect, such as altering the supply-and-demand relationships in the interstate commodity market. See also *Perez* v. *United States,* 402 U. S. 146, 154 (1971) ("Where the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class"). As

summarized by one commentator: "In recent years, Congress has relied upon the 'cumulative effect' principle as its constitutional justification for civil rights legislation, certain criminal statutes, regulatory measures affecting the sale of foods and additives, and a registration law for drug producers. In each case, congressional fact-findings stressed that the regulation of local incidents of an activity was necessary to abate a cumulative evil affecting national commerce." L. Tribe, American Constitutional Law. 237 (1978).

Despite the holdings of these cases, and the broad dicta often contained therein, there *are* constitutional limits on the power of Congress to regulate pursuant to the Commerce Clause. As Chief Justice Hughes explained:

"Undoubtedly the scope of this power must be considered in light of our dual system of government and may not be extended so as to embrace effects on interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government." *NLRB* v. *Jones & Laughlin Steel Corp., supra,* at 37.

And Justice Cardozo, in his cogent writing on the subject, often expressed his concern about too broad a reading of the commerce power. In his concurring opinion in *Schechter Poultry Corp.* v. *United States,* 295 U. S. 495, 554–555 (1935), he observed:

"There is a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce. Motion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center. A society such as ours 'is an elastic medium which transmits all tremors throughout its territory; the only question is of size.' . . . The law is not indifferent to considerations of degree. Activities local in their immediacy do not become interstate

and national because of distant repercussions. . . . To find immediacy or directness here is to find it almost everywhere. If centripetal forces are to be isolated to the exclusion of the forces that oppose and counteract them, there will be an end to our federal system."

Justice Cardozo elaborated on this point in his separate opinion in *Carter* v. *Carter Coal Co.,* 298 U. S. 238, 327 (1936).

"Mining and agriculture and manufacture are not interstate commerce considered by themselves, yet their relationship to that commerce may be such that for the protection of the one there is need to regulate the other. *Schechter Poultry Corp.* v. *United States* . . . . Sometimes it is said that the relation must be 'direct' to bring that power into play. In many circumstances such a description will be sufficiently precise to meet the needs of the occasion. But a great principle of constitutional law is not susceptible of comprehensive statement in an adjective. The underlying thought is merely this, that 'the law is not indifferent to considerations of degree.' *Schechter Poultry Corp.* v. *United States, supra,* concurring opinion, p. 554. It cannot be indifferent to them without an expansion of the commerce clause that would absorb or imperil the reserved powers of the states. At times, as in the case cited, the waves of causation will have radiated so far that their undulatory motion, if discernible at all, will be too faint or obscure, too broken by cross-currents, to be heeded by the law."

Thus it would be a mistake to conclude that Congress' power to regulate pursuant to the Commerce Clause is unlimited. Some activities may be so private or local in nature that they simply may not be *in* commerce. Nor is it sufficient that the person or activity reached have *some* nexus with interstate commerce. Our cases have consistently held that the regulated activity must have a *substantial* effect on

interstate commerce. *E. g., NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S., at 37 (local activities may be regulated if they have a "close and substantial relation to interstate commerce"). Moreover, simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so. Congress' findings must be supported by a "rational basis" and are reviewable by the courts. Cf. *Perez* v. *United States,* 402 U. S., at 157 (STEWART, J., dissenting).* In short, unlike the reserved police powers of the States, which are plenary unless challenged as violating some specific provision of the Constitution, the connection with interstate commerce is itself a jurisdictional prerequisite for any substantive legislation by Congress under the Commerce Clause.

In many ways, the Court's opinions in these cases are consistent with that approach. In both the Virginia and Indiana cases, the Court exhaustively analyzes Congress' articulated justifications for the exercise of its power under the Commerce Clause and concludes that Congress' detailed factual findings as to the effect of surface mining on interstate commerce are sufficient to justify the exercise of that power. Though there can be no doubt that Congress in regulating surface mining has stretched its authority to the "nth degree," our prior precedents compel me to agree with the Court's conclusion. I therefore concur in the judgments of the Court.

There is, however, a troublesome difference between what the Court does and what it says. In both cases, the Court asserts that regulation will be upheld if Congress had a rational basis for finding that the regulated activity affects

---

*Of course, once the power of Congress to regulate is established, the Court will rarely question the manner in which that power is exercised. *E. g., U. S. Railroad Retirement Bd.* v. *Fritz,* 449 U. S. 166 (1980). Within its sphere of authority, the power of Congress is broad and should only rarely be subject to judicial invalidation. The question here, in contrast, is whether Congress even has the authority to act.

interstate commerce. *Virginia Surface Mining, ante,* at 276; *Indiana, post,* at 323–325. The Court takes this statement of the proper "test" from *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 258 (1964). In my view, the Court misstates the test. As noted above, it has long been established that the commerce power does not reach activity which merely "affects" interstate commerce. There must instead be a showing that regulated activity has a *substantial effect* on that commerce. See *NLRB* v. *Jones & Laughlin Steel Corp., supra; Shreveport Rate Cases,* 234 U. S. 342 (1914); *Wickard* v. *Filburn,* 317 U. S., at 125 (local activity may be reached by Congress if "it exerts a substantial economic effect on interstate commerce"); *North American Co.* v. *SEC,* 327 U. S. 686, 705 (1946) (Congress may attack an evil which bears a "substantial relationship to interstate commerce"). As recently as *Maryland* v. *Wirtz,* 392 U. S. 183, 197, n. 27 (1968), Justice Harlan stressed that "[n]either here nor in *Wickard* has the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities." Even in *Heart of Atlanta Motel, Inc.,* in the paragraph just prior to the passage relied on by the Court here, the Court emphasized that Congress had the power to regulate local activities "which might have a substantial and harmful effect upon that commerce." 379 U. S., at 258. Though I believe the Court errs in its statement of the "test," it may be that I read too much into the Court's choice of language. In the Virginia case, for example, it does mention at one point that Congress did have a "rational basis for concluding that surface coal mining has substantial effects on interstate commerce." *Ante,* at 280.

In sum, my difficulty with some of the recent Commerce Clause jurisprudence is that the Court often seems to forget that legislation enacted by Congress is subject to two different kinds of challenge, while that enacted by the States is subject to only one kind of challenge. Neither Congress nor

the States may act in a manner prohibited by any provision of the Constitution. Congress must show that the activity it seeks to regulate has a substantial effect on interstate commerce. It is my uncertainty as to whether the Court intends to broaden, by some of its language, this test that leads me to concur only in the judgments.