**Sheriff J.R. KOOG, Val Verde County, Texas, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. DR–94–CA–8.**

United States District Court,
W.D. Texas,
Del Rio Division.

May 31, 1994.

William J. Stroman, Del Rio, TX, Stephen P. Halbrook, Fairfax, VA, for plaintiff.

Sandra Schraibman, Dennis G. Linder, Dept. of Justice, Civil Div., Washington, DC, for defendant.

## ORDER ON CONSTITUTIONALITY

PRADO, District Judge.

On this date came on to be considered the status of the above-styled and numbered cause. After careful consideration of all the papers and pleadings on file and the evidence and arguments of counsel presented at the hearing in this matter held on April 15, 1994, this Court is of the opinion that all relief requested by Plaintiff in this case should be denied.

### THE BRADY ACT

Plaintiff, the Sheriff of Val Verde County, Texas ("Sheriff Koog") filed this action on March 9, 1994, seeking a declaration that 18

U.S.C. § 922(s) violated the Tenth[1] and Fifth Amendments[2] to the United States Constitution and seeking injunctive relief against enforcement of that section. The Brady Act, Pub.L. No. 103–159, 107 Stat. 1536 (1993), created § 922(s) and changed the procedure for buying handguns[3] in this country. Sheriff Koog, relying on *New York v. United States*, —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), contends that § 922(s) incorporates "state governments into the service of federal regulatory purposes, and would for this reason be inconsistent with the Constitution's division of authority between federal and state governments." *Id.* —— U.S. at ——, 112 S.Ct. at 2428. Sheriff Koog also argues that the Brady Act subjects him to criminal penalties without clearly defining his duties in violation of the Due Process Clause of the Fifth Amendment. The Court held a hearing on Sheriff Koog's motion for a preliminary injunction on April 15, 1994, which the parties agreed to convert to a full trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).

Under § 922(s) a handgun purchaser must provide the seller with a valid photograph identification containing the purchaser's name, address, and date of birth. Furthermore, the purchaser is: 1) not under indict-ment for or convicted of a felony; 2) not a fugitive from justice; 3) not an unlawful abuser of controlled substances; 4) not been committed to a mental institution; 5) not an alien unlawfully in the United States; 6) not dishonorably discharged from the armed forces; 7) and has never renounced United States Citizenship. The seller must then verify the identity of the transferee and furnish a copy of the purchaser's statement to the chief law enforcement officer in the county where the purchaser resides. A sale of a handgun may not be completed until either five days have passed and the chief law enforcement officer has not notified the seller that the purchase would be unlawful or the seller has learned from the chief law enforcement officer that the sale would not be unlawful, whichever is sooner.

The Brady Act also places duties on the chief law enforcement officer[4], a state officer, in every locality. Pursuant to § 922(s)(2), chief law enforcement officers receiving information on possible gun sales, must make a "reasonable effort" to determine in five days if the sale would be unlawful.[5] If the chief law enforcement official does not find that the sale would violate any laws, then that official must destroy any information provided within 20 days.[6] Should

1. U.S. Const. amend. X states:

   The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

2. U.S. Const. amend. V states:

   No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

3. The Brady Act defined "Handgun" by amending 18 U.S.C. § 921(a) to create a new subsection (29) which states:

   The term 'handgun' means—

   (A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and
   (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled.

4. 18 U.S.C. § 922(s)(8) defines 'chief law enforcement officer', "For purposes of this subsection, the term 'chief law enforcement officer' means the chief of police, the sheriff, or an equivalent officer or the designee of any such individual."

5. 18 U.S.C. § 922(s)(2) states in its entirety:
   A chief law enforcement officer to whom a transferor has provided notice pursuant to paragraph (1)(A)(i)(II) shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, including research in whatever State and local recordkeeping systems are available and a national system designated by the Attorney General.

6. 18 U.S.C. § 922(s)(6)(B) states:
   Unless the chief law enforcement officer to whom a statement is transmitted under para-

a chief law enforcement officer block a sale of a handgun, the rejected purchaser can require that officer to provide the reasons why in writing within 20 days.[7] Finally, the Brady Act amends 18 U.S.C. § 924(a) to make violations of § 922(s) a crime punishable by a fine of up to $1,000 and/or imprisonment for up to one year.[8]

The Brady Act makes this records check by officers of the state only temporary. Pursuant to section 103 of the act, the Attorney General must establish a national instant criminal background check system by November of 1998. After establishment of the national system, gun vendors can contact the federal system directly by phone to determine if there is reason to believe that a particular sale would be in violation of the law. Thus, state officials will only be involved in the record check function on a temporary basis.

The Bureau of Alcohol, Tobacco, and Firearms ("BATF") issued an interpretation of the Brady Act in an Open Letter to State and Local Law Enforcement Officials on January 21, 1994. Pursuant to that interpretation, each chief law enforcement official has the discretion to determine what constitutes a reasonable search of state and national records. The letter states:

> Each law enforcement agency serving as the CLEO will have to set it (sic) own standards based on its own circumstances, *i.e.*, the availability of resources, access to records, and taking into account the law enforcement priorities of the jurisdiction. The law is designed so that the law enforcement authority who is doing the

check, is the one who is most likely to have to deal with the consequences of the buyer obtaining a handgun. Therefore, the CLEO of the buyer's residence has a vested interest in conducting an appropriate check and ultimately is in the best position to determine what is reasonable.

Indeed, the BATF concludes that in certain instances the only reasonable background check is no background check, "In rural, sparsely populated counties where many handgun purchasers are personally known to the CLEO, little or no research may be necessary in many cases." The Brady Act thus gives great discretion to each chief law enforcement official to determine what is or is not a reasonable background check.

## SHERIFF KOOG CAN BRING A TENTH AMENDMENT CHALLENGE

The Government argues that Sheriff Koog lacks standing to bring a Tenth Amendment challenge to the Brady Act. Although all parties referred to the Government's argument as a standing argument, the Court notes that the argument raises issues of standing, a real party in interest, and lack of capacity pursuant to Federal Rule of Civil Procedure 17(b). While confusion between these concepts occurs with some degree of frequency,[9] the Court will maintain a rigid distinction between the issues to provide a clearer analysis in this case. Before addressing Sheriff Koog's standing, interest and capacity to present the issues in this case, the Court briefly digresses to contrast these concepts.

graph (1)(A)(i)(IV) determines that a transaction would violate Federal, State, or local law—

(i) the officer shall, within 20 business days after the date the transferee made the statement on the basis of which the notice was provided, destroy the statement, any record containing information derived from the statement, and any record created as a result of the notice required by paragraph (1)(A)(i)(III)

**7.** 18 U.S.C. § 922(s)(6)(C) states:

If a chief law enforcement officer determines that an individual is ineligible to receive a handgun and the individual requests the officer to provide the reason for such determination,

the office shall provide such reasons to the individual in writing within 20 business days after the receipt of the request.

**8.** The parties dispute whether the penalty provisions apply to law enforcement officials. As more fully discussed below, the Court concludes that the penalty provisions do not apply to chief law enforcement officers.

**9.** One treatise notes, "Thus, it is not surprising that courts and attorneys frequently have confused the requirements for standing with those used in connection with real party in interest or capacity principles." 6A Charles A. Wright, Arthur R. Miller, & Mary K. Kane, *Federal Practice and Procedure* § 1542 (1990).

■ The standing requirement derives from the case or controversy language contained in Article III of the United States Constitution.[10] Standing doctrine encompasses both self-imposed prudential limitations on the exercise of jurisdiction and constitutionally mandated limitations that protect separation of powers. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). To satisfy the constitutional component of standing a plaintiff must show, "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Id.* Thus a plaintiff must show an "injury in fact" resulting from the alleged unconstitutional acts challenged.

■ The requirement of capacity derives from Federal Rule of Civil Procedure 17. Capacity refers to a party's ability to sue and be sued in federal court. 6A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure,* § 1542 (1990). Capacity must be determined with reference to state law and without reference to the particular claim or defense asserted. *Id.* at § 1559. The concept of real party in interest insures that a particular plaintiff only asserts rights belonging to that plaintiff. *Id.* at § 1542.

■ In the present case the Court finds that Sheriff Koog possesses standing and capacity and he is at least one real party in interest. The challenged provisions of § 922(s) mandate actions by Sheriff Koog as the chief law enforcement officer of Val Verde County; actions Sheriff Koog claims are unconstitutional. Sheriff Koog thus shows personal injury (the unlawful man-

dates) directly traceable to Defendant's actions and likely to be cured by the injunctive and declaratory relief he requests. *See e.g., Lujan v. Defenders of Wildlife,* — U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).[11]

■ Questions of Sheriff Koog's capacity are more complicated. The Government argues that Sheriff Koog lacks capacity separate from Val Verde County to bring a suit in federal court. The Court finds the Government's argument unpersuasive for three reasons. First, under state law elected officials have capacity to bring suit to determine rights and responsibilities those officials maintain. A Texas appellate court explained:

> It is only logical that the Board, created by statute and elected by the citizenry, should be able to come to the Court for relief to declare its responsibilities and rights and seek protection of those powers entrusted to it by the city charter. The fact that the city charter does not specifically give the Board the power to sue does not preclude the Board from responding affirmatively to an action brought against it by the City.... It simply sought a declaration of the rights that it has pursuant to the city charter and applicable law as an elected body of the City of Robstown. The fact that the Board is delegated only proprietary functions does not prohibit the Board from bringing suit to determine what those functions entail.

*Robstown v. Barrera,* 779 S.W.2d 83, 85 (Tex. App.—Corpus Christi 1989). Similarly, in this case, Sheriff Koog, an elected official to an office created by the Texas Constitution, must have the right to come into court to determine his rights and responsibilities.

---

10. U.S. Const. art. III, § 2, cl. 1 states:

The judicial Power shall extend to all Cases, in Law and Equity arising under this Constitution, the Laws of the United States and Treaties made, or which shall be made, under their Authority;-to all Cases affecting Ambassadors, other public Ministers and Consuls;-to all Cases of admiralty and maritime Jurisdiction;-to Controversies to which the United States shall be a Party;-to Controversies between two or more states;-between a State and Citizens of another State;-between Citizens of different States;-between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens

thereof, and foreign States, Citizens or Subjects.

11. In *Lujan* the Supreme Court wrote:

When the suit is one challenging the legality of government action ... the nature and extent of facts that must be ... proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or foregone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

— U.S. at ——, 112 S.Ct. at 2137.

Second, sheriffs are frequently sued for various violations of federal civil rights. Suit could not be maintained against sheriffs if they lacked capacity under state law.[12] Finally, should Sheriff Koog chose to ignore his duties under the Brady Act, a mandamus action would lie against him. Sheriff Koog must have some ability to raise his defenses to any such action and therefore he must have the corresponding right to bring a declaratory judgment action about the constitutionality of the source of any duties. 28 U.S.C. § 2201. ("In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration ...").

■ Although Val Verde County may be a real party in interest, the Court concludes that Sheriff Koog also has that status. Sheriff Koog argues that he must expend scarce resources of his office on background checks. Such a concern implicates the county because any resources are county resources. As an elected county official, however, Sheriff Koog also has an interest in an efficient and capable sheriff's department. Therefore, Sheriff Koog has an interest in the subject of the present litigation and the Court concludes that Sheriff Koog is a proper party to bring the present constitutional challenge to the Brady Act.

### THE TENTH AMENDMENT AND MANDATORY DUTIES PLACED UPON THE STATES

■ Supreme Court decisions about the Tenth Amendment do not reflect a pattern of straight line development of a theme. Rather the cases seem to reflect a series of shifting perspectives on the nature and breadth of the powers reserved to the states under the Tenth Amendment leaving lower courts with few concrete principles to decide cases. Faced with the various and arguably contradictory precedents, this Court has no better guide than simply to align the principles enunciated in these cases on a continuum and decide where the instant case falls.

The trail begins with *National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). In that case, the Supreme Court considered amendments to the Fair Labor Standards Act ("FLSA") that made that act applicable to all employees of state and local governments. Justice Rehnquist's majority opinion held that those amendments intruded upon an inviolable area of state sovereignty "essential to separate and independent existence." *Id.,* 426 U.S. at 845, 96 S.Ct. at 2471 *quoting Coyle v. Oklahoma,* 221 U.S. 559, 580, 31 S.Ct. 688, 695, 55 L.Ed. 853 (1911). Justice Rehnquist further held that Congress could direct legislation towards individual business pursuant to its Commerce Clause powers, but could not legislate about the "States as States". *National League,* 426 U.S. at 845, 96 S.Ct. at 2471.[13]

Justice Brennan in his dissent in *National League* argued that the Tenth Amendment does not restrain the Commerce Clause power. According to the dissent, restraints on

---

**12.** Much has been made of the fact that sheriffs do not routinely bring law suits. Perhaps the lack of litigation by sheriffs developed as a historical fact or perhaps in most affirmative litigation sheriffs would lack standing or a real interest. The Court does not need to address the non-litigious past of sheriffs in Texas. Suffice it to say that sheriffs have capacity to be sued and to sue if conditions warrant.

**13.** This Court cannot determine on which line of reasoning the Supreme Court relied. On one hand, the opinion in *National League* implies that there are certain functions of state sovereignty which cannot be invaded. On the other hand, *National League* appears to stand for the proposition that the federal government can never require the states to do anything even if the legisla-

tion applies in a non-discriminatory manner to both private and state entities. Compare:

> We hold that insofar as the challenged amendments operate to directly displace the State's freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted Congress by Art. 1, § 8, cl. 3

426 U.S. at 852, 96 S.Ct. at 2474, with

> It is one thing to recognize the authority of Congress to enact laws regulating individual businesses necessarily subject to the dual sovereignty of the government of the Nation and the State in which they reside. It is quite another to uphold a similar exercise of congressional authority directed, not to private citizens, but to the States as States.

426 U.S. at 845, 96 S.Ct. at 2471.

the Commerce Clause could be found in specific provisions of the Constitution but no restraint could be found in a general concept of state sovereignty. The political process protected state's concerns about their sovereignty when facing federal statutes enacted under the Commerce Clause. 426 U.S. at 867–869, 96 S.Ct. at 2481–82. Any notion of state sovereignty that can be judicially protected was "an abstraction without substance...." 426 U.S. at 860, 96 S.Ct. at 2478. For Justice Brennan then, the Tenth Amendment did not express a concept of state sovereignty limiting the powers of the federal government, rather the Tenth Amendment requires only that Congressional legislation be grounded in a delegated power. 426 U.S. at 861–862, 99 S.Ct. at 2479.

The Supreme Court next considered the Tenth Amendment and restrictions on the commerce power in *Hodel v. Virginia Surface Mining & Reclamation Ass'n.*, 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Justice Marshall's opinion for the Court significantly refined the principles announced in *National League of Cities*. In *Hodel* the Court announced a three prong test to invalidate legislation on Tenth Amendment grounds: (1) the challenged statutes must regulate the states as states; (2) the statutes must impact on matters that are indisputably attributes of state sovereignty; and (3) state compliance with federal law must directly impair the state's ability to structure integral operations in areas of traditional governmental functions. 452 U.S. at 287–88, 101 S.Ct. at 2366. In a footnote, Justice Marshall further suggested that even if all three requirements are met, the legislation may still be upheld if the federal interest advanced significantly outweighs any state interest. *Id.* at note 29.

The very next year the Supreme Court again considered the Tenth Amendment and the restrictions it places on Congress' exercise of its Commerce Clause powers in *FERC v. Mississippi*, 456 U.S. 742, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). In that case the Court considered the Public Utility Regulatory Policies Act of 1978, Pub.L. 95–617, 92 Stat. 3117 ("PURPA") which required state utility regulatory commissions and nonregu-

lated utilities to consider, but not necessarily adopt, several rate structures and regulatory standards. Furthermore PURPA required that these entities consider the federal proposals at public hearings and issue a written statement of reasons if the utility or commission rejected any of the federal standards. PURPA also gave the federal government and affected consumers the right to intervene in such proceedings and to seek judicial review of any decisions. The nonregulated utilities and state regulatory commissions had to submit annual reports for ten years to the federal government on consideration of the federal standards. Separately, PURPA authorized the Federal Energy Regulatory Commission to issue regulations encouraging cogeneration even if those regulations conflicted with state regulations. The Commission did issue such preemptive regulations but left state regulatory authorities the discretion to implement those regulations either through adjudicatory proceedings or issuance of regulations.

Justice Blackmun wrote the opinion for the majority in *FERC*, upholding the challenged provisions of PURPA. Justice Blackmun did not express an opinion as to whether the Tenth Amendment imported concepts of state sovereignty into limits on the commerce power or whether the Tenth Amendment merely required Congress to exercise only delegated powers. Instead Justice Blackmun found that state utility regulatory commissions were equivalent to judicial tribunals and that the federal government had the power to require these tribunals to enforce federal law under the holding in *Testa v. Katt*, 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947) (federal government can require state courts to hear federal claims). *FERC*, 456 U.S. at 760, 102 S.Ct. at 2138. Therefore, PURPA's preemptive regulations did not raise any Tenth Amendment concerns.

Justice Blackmun further considered whether Congress could require state regulatory commissions to consider adoption of federal standards. He rejected the Civil War view that Congress could never impose mandatory duties on state officers. *Id.*, 456 U.S. at 761, 102 S.Ct. at 2138. Reviewing recent cases, Justice Blackmun concluded that fed-

eral statutes could require state decisionmakers to take or refrain from taking actions. *Id.,* 456 U.S. at 762, 102 S.Ct. at 2139. Because PURPA only required state utility regulators to consider federal standards and states could avoid the requirement by abolishing their utility regulators, Justice Blackmun did not find PURPA to infringe impermissibly on state sovereignty. *Id.,* 456 U.S. at 763–64, 102 S.Ct. at 2140. Importantly for Justice Blackmun, PURPA did not require the states to adopt a legislative program, even if it encouraged states to take actions that could not be mandated by federal power. *Id.,* 456 U.S. at 765–66, 102 S.Ct. at 2140–41.

Justice Powell concurred in part and dissented in part. Justice Powell disagreed with the majority that the federal government could prescribe procedures which state regulatory agencies had to follow in considering the federal proposals. Justice Powell argued that procedures define the nature of a state administrative agency and federal alteration of those procedures intruded too far on the right of states to structure their own affairs. *Id.,* 456 U.S. at 773–75, 102 S.Ct. at 2145. Justice Powell disagreed with Justice O'Connor's dissent, however finding that Congress could require state regulators to consider federal proposals. *Id.,* 456 U.S. at 775, 102 S.Ct. at 2145–46. Justice Powell thus concluded that Congress could mandate that state officials take some actions, but not others.

Justice O'Connor, laying the foundation for her *New York* decision, dissented in *FERC.*[14] Justice O'Connor returned to the notion of state sovereignty that the *National League of Cities* Court found in the Tenth Amendment. Justice O'Connor would have invalidated even those portions of PURPA that would only require the state regulatory agencies to consider federal proposals because attributes of sovereignty include the power to set a legislative agenda. 456 U.S. at 779, 102 S.Ct. at 2148. ("If Congress routinely required the state legislatures to debate bills drafted by congressional committees, it could hardly be questioned that the practice would affect an attribute of state sovereignty.") In this way, Justice O'Connor could distinguish

*Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947), which held that state trial courts could not refuse to hear a federal claim if it heard similar state claims. Justice O'Connor concluded that state courts cannot set their own agendas, therefore requirements that they hear federal claims do not tread on state sovereignty. *FERC,* 456 U.S. at 784–85, 102 S.Ct. at 2126. Accordingly, for Justice O'Connor, the Tenth Amendment protects states from federal intrusions into their legislative processes, but not their judicial processes.

Justice O'Connor found another reason to distinguish federal encroachment on state legislative functions from encroachment on state judicial functions. Citizens cannot hold the proper officials accountable when the federal government forces state officials to debate federal propositions. 456 U.S. at 787, 102 S.Ct. at 2152. As Justice O'Connor explained, "Congressional compulsion of state agencies, unlike preemption blurs the lines of political accountability and leaves citizens feeling that their representatives are no longer responsive to local needs." *Id.*

Finally, Justice O'Connor turned to the framing of the Constitution. In her view, the framers of the Constitution reacted to the inefficiencies of the Articles of Confederation. Particularly, the framers wanted a national government that could act on individuals as opposed to states. Quoting from The Federalist No. 16, Justice O'Connor concluded, "the execution of the laws of the national government ... should not require the intervention of the State Legislatures,". 456 U.S. at 791–93, 102 S.Ct. at 2154–55. From this history Justice O'Connor concludes that the national government may only direct legislation at individuals, not the states.

Subsequently, in *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), the Court held that amendments extending the Age Discrimination in Employment Act ("ADEA") to employees of state and local governments were constitutional under the Tenth Amendment. Justice Brennan wrote the opinion for the majority. Although Justice Brennan argued in his dissent

14. Chief Justice Burger and Justice Rehnquist

joined Justice O'Connor in her dissent.

in *National League of Cities* that the Tenth Amendment imposes no restraints on exercises of the commerce power, he analyzed the ADEA in terms of the framework established in *National League of Cities* and *Hodel.* 460 U.S. at 236, 103 S.Ct. at 1060. Justice Brennan noted that the third prong of the *Hodel* test required a consideration of the degree of impairment of a state's ability to structure its integral operations. 460 U.S. at 239, 103 S.Ct. at 1062. Finding the ADEA to only slightly intrude on this state interest, the Court upheld the challenged amendments. *Id.*

Justice Stevens concurred in *Wyoming.* Justice Stevens returned to the view expressed in Justice Brennan's dissent in *National League of Cities.* According to this view, the Tenth Amendment does not constrain Congressional exercise of the Commerce Power because the Tenth Amendment merely restricts Congress to delegated powers. 460 U.S. at 248, 103 S.Ct. at 1066–67. Justice Stevens therefore argued that *National League of Cities* should be overruled.[15] Justice Powell joined by Justice O'Connor dissented primarily to respond to Justice Stevens' concurrence. Justice Powell found that the Constitution included a notion of state sovereignty that precluded congressional action in some areas. 460 U.S. at 275, 103 S.Ct. at 1080–81.

In *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985), the Court once again addressed whether the Fair Labor Standards Act ("FLSA") could be extended to all state and local government employees. The Court specifically overruled *National League of Cities*, 469 U.S. at 536, 105 S.Ct. at 1009–10. Justice Blackmun again wrote the opinion for the majority. He first found the

standard in *National League of Cities* that protected areas of traditional state functions to be unworkable because the Supreme Court could not decide how to determine which state functions were "traditional". 469 U.S. at 537–47, 105 S.Ct. at 1010–15. Although Justice Blackmun agreed that the federal structure of the United States placed limits on the power of the federal government to interfere with state sovereignty, he found that those limits were unclear. 469 U.S. at 547, 105 S.Ct. at 1016.

Justice Blackmun turned to his own interpretation of the intent of the framers of the Constitution. Unlike Justice O'Connor, he did not rely on "freestanding conceptions of state sovereignty." 469 U.S. at 550, 105 S.Ct. at 1017. Instead, Justice Blackmun found Congress' power restrained because Congress could only exercise delegated powers. Furthermore, state sovereignty received protection from the states' position in the structure of the republic. Representation by state in the Senate, House of Representatives, and College of Electors preserved state interests against federal encroachment because the states had a direct voice in the formulation of federal policy. 469 U.S. at 550–551, 105 S.Ct. at 1017–18.[16]

Justice Powell wrote separately in dissent.[17] Justice Powell interpreted *National League of Cities* to require a balancing test weighing the respective interests of the states and the federal government. 469 U.S. at 562–63, 105 S.Ct. at 1023–24. Turning to the intent of the framers, Justice Powell offered a third interpretation of the drafting and adoption of the Constitution. According to Justice Powell's version of ratification, the Tenth Amendment was so central to the Constitution that the states would have refused ratification if the Tenth Amendment had not

---

**15.** Justice Burger dissented. Justice Burger disputed the majority's decision that the act did not significantly interfere with the state's ability to structure its integral governmental operations. 460 U.S. at 258, 103 S.Ct. at 1072. Justices Powell, Rehnquist, and O'Connor joined Justice Burger.

**16.** *Justice Blackmun summarized his views:*
In short, the Framers chose to rely on a federal system in which special restraints on federal power over the States inhered principally in

the workings of the National Government itself, rather than in discrete limitations on the objects of federal authority. State sovereign interests, then, are more properly protected by procedural safeguards inherent in the structure of the federal system than by judicially created limitations on federal power.
469 U.S. at 552, 105 S.Ct. at 1018.

**17.** Justices Burger, Rehnquist, and O'Connor joined Justice Powell's dissent.

been one of the first considerations of the new Congress. 469 U.S. at 569, 105 S.Ct. at 1027. From this history, Justice Powell concludes that the judiciary must enforce the principles of the Tenth Amendment.

Justice Powell looked to the Federalist Papers to attempt to define those inviolate areas of state sovereignty protected by the Tenth Amendment. 469 U.S. at 570–72, 105 S.Ct. at 1027–28.[18] Whatever the content of those specific areas that are either the "traditional", "typical" or "sovereign", Justice Powell believed that the judiciary had a duty to invalidate any federal action that encroached on those grounds. The courts, Justice Powell concluded, must balance the federal interest in interstate commerce with the concern of the states for local, democratic self-government. 469 U.S. at 575, 105 S.Ct. at 1030. Applying this balance to the FLSA, Justice Powell found that the states' interest in a traditional government function greatly outweighed any effect that reduced wages for municipal transportation workers might have on interstate commerce and therefore invalidated the subject provisions. 469 U.S. at 578–79, 105 S.Ct. at 1032.

Justice O'Connor also wrote a dissenting opinion in *Garcia*.[19] Justice O'Connor surveyed the vast changes in the American economy that lead to expansion of Congress' power under the Commerce Clause. Justice O'Connor argued however that both the ends and the means of Congressional legislation must be valid. 469 U.S. at 585, 105 S.Ct. at 1036. In assessing the means Congress has chosen to reach its ends, courts must consider both the letter and the spirit of the Tenth Amendment. 469 U.S. at 586, 105 S.Ct. at

1036. Therefore, if Congress attempts to regulate a matter admittedly within the commerce power, the Court must still strike down the legislation if it interferes with state autonomy. 469 U.S. at 588, 105 S.Ct. at 1037. Justice O'Connor did not define state autonomy in her dissent, rather she predicted that the Court would return to that question. *Id.*

The Court applied its analysis in *Garcia* to a section of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") in *South Carolina v. Baker*, 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988). Although that section merely removed the federal income tax exemption of state and local government bearer bonds, the Court analyzed the act "as if it directly regulated States by prohibiting outright the issuance of bearer bonds." 485 U.S. at 511, 108 S.Ct. at 1360. Justice Brennan's opinion for the Court specifically found such a direct regulation of the states as states to be consistent with the Tenth Amendment as South Carolina did not show any defect in the political process that lead to the adoption of the TEFRA. State representation in that political process protected any concerns for state sovereignty. 485 U.S. at 513, 108 S.Ct. at 1361. Justice Brennan sustained the act even though it coerced both state administrative and legislative processes. 485 U.S. at 514–15, 108 S.Ct. at 1362 ("That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect.")

---

18. In attempting to define the areas of state sovereignty Justice Powell quotes from The Federalist No. 45 which states:

The powers reserved to the several States will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State.

469 U.S. at 570–71, 105 S.Ct. at 1028.

Such generalities appear open to the criticism of the majority opinion that no real standards guide the judiciary in determining what areas of state sovereignty are protected from federal encroachment. This Court cannot conceive of any legislation, federal or state that does not extend

to the "lives, liberties and properties of the people; and the internal order, improvement, and prosperity of the State."

19. Justice O'Connor's opinion was joined by Justice Rehnquist and Justice Powell. Justice Rehnquist wrote a brief dissenting opinion where he expressed his view that neither Justice Powell's opinion or Justice O'Connor's opinion were completely faithful to the principles of *National League of Cities*. However, Justice Rehnquist declined to enunciate those principles. Rather he decided to wait until *National League of Cities* once again commanded a majority. 469 U.S. at 579–80, 105 S.Ct. at 1032–33.

Justice Scalia concurred in *Baker.* Justice Scalia argued that *Garcia* held that the Constitution imposed limits on Congress' power under the Commerce Clause but those limits were not identified. He further argued that the statute at issue did not surpass those limits. 485 U.S. at 528, 108 S.Ct. at 1369. Justice Rehnquist also concurred. He found that because the TEFRA had only a *de minimis* impact upon the states, the act presented no Tenth Amendment concerns. 485 U.S. at 529, 108 S.Ct. at 1370. Justice O'Connor dissented. She found that the Tenth Amendment and principles of federalism required state exemption from federal taxation. 485 U.S. at 533–534, 108 S.Ct. at 1372. The concurrences and dissent all found some judicially enforceable restraint on the Commerce Clause in the Tenth Amendment although they disagreed on how to articulate that restraint or its extent.

Only in light of this fractious and complex history can the Court properly consider the Supreme Court's most recent Tenth Amendment decision in *New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). The *New York* case addressed the constitutionality of three provisions of the Low–Level Radioactive Waste Policy Amendments Act of 1985. To encourage each state to take responsibility for low-level radioactive waste produced within its borders, Congress approved monetary incentives, access incentives denying states without plans access to current waste disposal sites, and a "take title" provision which required a state to take title to all waste that is produced but which is not properly disposed in that state after January 1, 1996. —— U.S. at ——, 112 S.Ct. at 2416.

Justice O'Connor, returning to many of the principles announced in her dissent in *FERC,* announced the opinion of the Court. Justice O'Connor reiterated her view that the Tenth Amendment incorporates extra-textual limits on the Commerce Clause:

The Tenth Amendment likewise restrains the power of Congress, but this limit is not derived from the text of the Tenth Amendment itself, which, as we have discussed, is essentially a tautology. Instead, the Tenth Amendment confirms the that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States. The Tenth Amendment thus directs us to determine, as in this case, whether an incident of state sovereignty is protected by a limitation on an Article I power.

—— U.S. at ——, 112 S.Ct. at 2418. Accepting that Congress' Commerce Clause power extended to the subject of low-level radioactive waste and Congress could preempt the field, Justice O'Connor then turned to whether the means Congress had chosen to achieve its ends were constitutional. —— U.S. at ——, 112 S.Ct. at 2420.

Relying on dicta in both *Hodel* and *FERC,* Justice O'Connor concluded that· Congress could not commandeer the legislative process of states. —— U.S. at —— ——, 112 S.Ct. at 2420–21. Justice O'Connor found support for this view in her review of the history of the drafting and ratification of the Constitution. The framers and ratifiers of the Constitution supported the Constitution because the federal government would have the power to legislate directly on individuals, not upon states as required under the Articles. of Confederation. —— U.S. at —— – ——, 112 S.Ct. at 2421–23.[20] Although the federal government has tools to encourage the states to adopt federal policy, Justice O'Connor held that Congress could not compel the states to regulate. —— U.S. at —— – ——, 112 S.Ct. at 2423–24.

Turning to the contested provisions of the Low–Level Waste Act, Justice O'Connor found no problem with the monetary incentives or the access incentives. These incentives merely represented valid exercises of the commerce power and the spending power. —— U.S. at ——, 112 S.Ct. at 2427. The

---

**20.** Justice O'Connor again makes a logical leap from the proposition that Congress could direct legislation towards individuals to the conclusion that Congress could not direct legislation towards the states. The sources Justice O'Connor cites do not clearly lead to this conclusion. These sources merely indicate that the Constitution gave the federal government the power to legislate directly on individuals, not that the Constitution prohibited Congress from directing legislation to the states.

"take title" provision, however, did not pass Constitutional muster. This provision gave the states the option of either adopting a plan consistent with Congress' standards or taking title to all waste produced within their individual state. Justice O'Connor found either choice to be beyond the power of Congress and therefore not a valid encouragement but an attempt to compel one of two courses of action, neither of which Congress could compel. —— U.S. at ——, 112 S.Ct. at 2428. Justice O'Connor distinguished the take title provision from Supreme Court cases requiring state courts to enforce federal law. Those cases reflected an application of the Supremacy Clause, not a requirement that states regulate. —— U.S. at —— – ——, 112 S.Ct. at 2429–30. Therefore, the Court severed the take title provision and upheld the other two provisions.[21]

This review of the Court's recent Tenth Amendment jurisprudence reveals a wide range of views about the restrictions that Amendment places on congressional exercise of the commerce power. At one extreme, the Supreme Court has viewed the Tenth Amendment as limiting Congress to delegated powers. This view found expression in Justice Brennan's dissent in *National League of Cities*, Justice Stevens' dissent in *Wyoming*, and Justice Blackmun's majority opinion in *Garcia*. At the other extreme, the Court has found that the Tenth Amendment expresses a concept of state sovereignty that independently limits Congressional exercise of the commerce power. Justice O'Connor's dissent in *FERC* and her majority opinion in *New York* have been the strongest expressions of this view. In the center lie a variety of views. For instance, the majority opinions in *National League of Cities*, *Hodel*, and *Wyoming*, as well as Justice Powell's concurrence in *FERC*, Justice Powell's dissent in *Garcia*, Justice Scalia's concurrence in *Baker*, and Justice Rehnquist's concurrence in *Baker* all have found the Tenth Amendment to impose some restraints on Congress. Those restraints extend to "integral opera-

tions", "typical" or "sovereign" functions, or more than "*de minimis*" intrusions. Thus, this middle ground has required a balancing of state and federal interests.

Whatever view a particular justice takes of the Tenth Amendment, all agree that the federal government can require state courts to adjudicate federal law claims. Further, with the exception of the majority opinion in *Baker*, all agree that the federal government cannot require the states to legislate. Court opinions do not reflect a clear position on whether Congress can require state executives to act pursuant to federal mandates. *Compare FERC*, 456 U.S. at 762, 102 S.Ct. at 2139 ("... there are instances where the Court has upheld federal statutory structures that in effect directed state decisionmakers to take or to refrain from taking certain actions.") *with New York*, —— U.S. at ——, 112 S.Ct. at 2429 ("Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents.").

After reviewing the Supreme Court's recent decisions, this Court concludes that no single decision controls the entire spectrum of Tenth Amendment analysis. Opinions such as *New York*, *Garcia*, and *FERC* all exist side by side as precedents binding on this Court.

Disregarding all prior Tenth Amendment cases, Sheriff Koog asks this Court to invalidate the Brady Act by taking a broad reading of *New York*. Indeed, Sheriff Koog in both his pleadings and at the hearing on this matter intimated that *New York* overruled *Garcia* and *FERC*. *See, e.g.*, Plaintiff's Reply To Defendant's Opposition to Motion for Preliminary Injunction, filed April 12, 1994, at pp. 23–24. Plaintiff rejects the *de minimis* test suggested by Justice Rehnquist as well as any other balancing test. Instead, Sheriff Koog argues that the federal government may *never* mandate *any* action by state officials.[22]

---

**21.** Justice White, with Justice Blackmun and Justice Stevens joining, filed a concurring and dissenting opinion. Justice Stevens filed a dissenting opinion.

**22.** At the hearing Plaintiff illustrated this broad reading of the Tenth Amendment by suggesting that the duties placed on state law enforcement agencies to report cases of missing children, 42 U.S.C. § 5779(a), and traffic fatality data, 23

The Court declines to base its decision on such a broad reading of the opinion in *New York*. Nor does this Court have the authority to reject the precedential value of *Garcia* and *FERC*. Instead the Court must align all of these cases on a continuum and find the Brady Act's position on that continuum. Under *New York*, the Tenth Amendment prohibits the federal government from commandeering state legislatures. However, under *FERC*, the Tenth Amendment does not prevent the federal government from imposing minimal duties on state executive officers.

The Court concludes that the duties imposed on chief law enforcement officers including Sheriff Koog resemble more the duties created under PURPA than the command to legislate created by the Low–Level Waste Act. As noted before, the Brady Act confers great discretion on each chief law enforcement officer to determine what is a reasonable background search under the circumstances. Indeed, under the Brady Act *no* search may be required if circumstances dictate such a conclusion. Furthermore, the duties placed on chief law enforcement officers are only temporary and are phased out within five years under the terms of the act. Such duties greatly resemble the requirement that state utility regulatory bodies consider federal standards imposed by PURPA and upheld in *FERC*. The Court therefore finds the Brady Act consistent with the Tenth Amendment even though it places some minimal duties upon state law enforcement officials.

## FIFTH AMENDMENT CONCERNS

■■■ Sheriff Koog also brings a Fifth Amendment challenge to the Brady Act. Sheriff Koog argues that the penalty provisions contained in § 924(a)(5) subject him to criminal liability for failing to make a reasonable effort to ascertain if a proposed sale

violates the law, but the statute is unconstitutionally vague because it does not define what would satisfy the reasonable effort requirement. The Court concludes that § 924(a)(5) does not apply to violations of the duties of chief law enforcement officers under the Brady Act and therefore Sheriff Koog lacks standing to bring his Fifth Amendment challenge.

■■■ In *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), the Supreme Court announced a new rule of statutory construction. Pursuant to this new rule, Congress must make a plain statement of its intent to exercise its Commerce Clause powers in an intrusive manner on state sovereignty. 501 U.S. at 464, 111 S.Ct. at 2403. ("Indeed, inasmuch as this Court in *Garcia* has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise.") If doubt exists as to whether a statute interferes with state sovereignty, then it must be interpreted to protect state sovereignty.

In the present case, Congress has not made a plain statement that the criminal provisions in § 924(a)(5) apply to chief law enforcement officers. Indeed, § 924(t)(6) shields chief law enforcement officials from *any* civil liability for actions taken pursuant to the Brady Act. Such a provision raises an issue as to whether Congress intended chief law enforcement officials to be subjected to more serious criminal sanctions. Given the ambiguities inherent in the statute and the lack of a plain statement from Congress, the Court concludes that under the rule announced in *Gregory*, the criminal provisions do not apply to duties imposed upon chief law enforcement officers by the Brady Act.[23] Therefore, Sheriff Koog has no standing to bring his Fifth Amendment challenge.

---

U.S.C. § 402(a), were "nice, but probably unconstitutional."

**23.** The Court draws support for this conclusion from *Sheriff/Coroner Jay Printz v. United States of America*, 854 F.Supp. 1503 (D.Mont.1994), although that court reached a different conclusion on the Tenth Amendment issue. Judge Lovell examined the intent of Congress, the rule of

lenity, and the rule of statutory construction requiring statutes to be construed to avoid constitutional problems and concluded that the criminal provisions do not apply to chief law enforcement officers. The Court also notes that the Department of Justice reached a similar conclusion in a Memorandum issued by the Office of Legal Counsel on March 16, 1994.

## CONCLUSION

The Court concludes that Sheriff Koog's constitutional challenge to the Brady Act must fail. Although Sheriff Koog has standing and capacity to assert a Tenth Amendment challenge, the Court concludes that the Brady Act does not violate Tenth Amendment principles because it does not "commandeer state legislatures", but instead only places minimal duties upon chief law enforcement officers. The Court further concludes that the Brady Act's criminal provisions do not apply to duties imposed upon chief law enforcement officials and, therefore, Sheriff Koog lacks standing to bring his Fifth Amendment challenge.

Accordingly, it is hereby ORDERED that judgment shall be ENTERED for Defendant on all of Plaintiff's claims.

It is further ORDERED that Plaintiff's complaint for declaratory and injunctive relief be DISMISSED WITH PREJUDICE.

It is finally ORDERED that all pending motions in this cause are hereby DENIED AS MOOT.