

# Office of the Attorney General
## State of Texas

**DAN MORALES**
ATTORNEY GENERAL

June 13, 1995

Mr. Don Gilbert
Commissioner
Texas Department of Mental Health
 and Mental Retardation
P.O. Box 12668
Austin, Texas 78711-2668

Opinion No. DM-353

Re: Effect of the Brady Handgun Violence
Prevention Act on the confidentiality of client
records of the Texas Department of Mental
Health and Mental Retardation   (RQ-731)

Dear Mr. Gilbert:

Your predecessor asks about the effect of the federal Brady Handgun Violence
Prevention Act (the "Brady Act") with regard to the disclosure of client records by the
Texas Department of Mental Health and Mental Retardation. Your predecessor's specific
questions are:

1) Is [the department] required to disclose client-identifying
information to law enforcement officers conducting background
searches pursuant to the Brady Act?

2) Does the Brady Act require disclosure without consent for the
following categories of persons . . . :

a) clients with mental illness or mental retardation who are
able to give consent;

b) clients with mental illness or mental retardation who have
court-appointed guardians; or

c) clients with mental illness or mental retardation who have
been court-committed to a facility under the Mental Health
Code and are unable to provide consent and have no legal
guardian?

As we will explain in what follows, it is our opinion that the provisions of the
Brady Act do not require the department to disclose, to law enforcement officers
performing background searches under the Brady Act, mental health records which would
not otherwise be available to those officers, that is, the Brady Act does not alter the
confidentiality status of such records under state law. We do not understand your
predecessor to ask and we therefore do not generally address here whether particular
mental health records are or are not available to law enforcement officers under state law.

The Brady Act, adopted in 1993,[1] amended federal firearms laws found in title 18 of the United States Code section 922 by providing among other things that, prior to transferring a handgun, a licensed "transferor" must notify the "chief law enforcement officer of the place of residence of the transferee,"[2] and, unless notified in the meantime by the law enforcement officer that the transfer is lawful, may not complete the transfer until five days have elapsed without the transferor's being notified by the law enforcement officer that the "receipt or possession of the handgun by the transferee would violate Federal, State, or local law." *Id.* 18 U.S.C. § 922(s)(1)(A).[3] Preexisting law in title 18 of the United States Code, section 922, makes it unlawful for a person to "receive any firearm . . . transported in interstate commerce or foreign commerce," *id.* subsec. (k), or "possess [any firearm] in or affecting commerce" if among other things he "has been adjudicated as a mental defective or . . . has been committed to any mental institution." *Id.* § 922(g).[4]

Subsection (s)(2) of 922 provides:

> A chief law enforcement officer to whom a transferor has provided notice . . . shall make a reasonable effort to ascertain within 5 business days whether receipt or possession would be in violation of the law, *including research in whatever State and local recordkeeping systems are available* and in a national system designated by the Attorney General.[5] [Emphasis added.]

The "national system" referred to in subsection (s)(2) has not yet been developed. Section 103 of the public law adopting the Brady Act requires the United States Attorney General to develop a national *criminal* background check system for purposes of theBrady

---

[1]Act of Nov. 30, 1993, Pub. L. 103-159, tit. I, 1993 U.S.S.C.A.N. (107 Stat.) 1536.

[2]*Id.* subsection (s)(8) defines such officer as the police chief, sheriff, or equivalent, or a designee of such.

[3]Subsection (s)(1) lists various exceptions to these requirements which do not appear relevant to your predecessor's request.

[4]The provisions of subsection (g) were originally added by Pub. L. No. 90-351, Title IV, § 902, June 19, 1968 82 Stat. 228 and amended by Pub. L. No. 90-618, Title I, Oct. 22, 1968, 82 Stat. 1216.

[5]We note that several federal district courts have found subsection (s)(2) unconstitutional under the Tenth Amendment in its *requiring* a chief law enforcement officer to perform the research provided for. *See Sheriff/Coroner Jay Printz v. United States,* (D. Mont. 1994); *Sheriff Richard Mack v. United States,* (D. Ariz. 1994); *Sheriff Samuel Frank v. United States,* (D. Vt. 1994); *McGee v. United States,* 863 F. Supp. 321 (S.D. Miss. 1994). *But see Koog v. United States,* 852 F. Supp. 1376 (W.D. Tex. 1994). The courts finding the act in part unconstitutional severed the requirement of law enforcement officer research from the rest of the act so that the officers will still be notified of a proposed transfer and the five day waiting period will still obtain, but the law enforcement officer's research will be voluntary. Whether the law officer's research is required or only voluntary does not, however, affect our conclusion here.

Act requirements by November 30, 1998. (It is perhaps because of these plans that, by its own terms, section (s)(1)'s requirement of a five-day waiting period applies only until the 1998 date.) However, with regard to a national system to identify other persons ineligible to purchase firearms—such as the persons about whom your predecessor is concerned—Congress has so far only directed the Attorney General to conduct a study. *See* Pub. L. No. 100-690, § 6213. Thus, the focus of his concern is the availability of your department's records to law enforcement officers performing research under subsection (s)(2). In this regard, he refers to the provisions of chapters 595 and 611 of the Health and Safety Code.

Section 595.001 provides that "[r]ecords of the identity, diagnosis, evaluation, or treatment of a person that are maintained in connection with the performance of a program or activity *relating to mental retardation* are confidential and may be disclosed only for the purposes and under the circumstances authorized under section 595.003 and 595.004." (Emphasis added.) Section 595.003, as pertinent here, permits, subject to department rules, disclosure of a record with the consent of "the person about whom the record is maintained," his parent if he is a minor, or his guardian if he has been adjudicated incompetent. Section 595.004 permits a person to obtain his own records, unless the responsible professional determines it is not in the person's best interest, or a parent if the person is a minor, or a guardian. Notably, section 595.003 expressly prohibits exchanges of records between governmental agencies except as necessary to deliver services to clients or obtain payment. Subsection (d) of section 595.005, however, does permit disclosure of all or parts of records "[i]f authorized by an appropriate order of a court of competent jurisdiction" upon application showing good cause, where the court has determined the need for disclosure outweighs the injury to the subject. Section 595.005 provides other exceptions to the section 595.003 consent requirements, but except for subsection (d) thereof they do not appear to be relevant here.

Health and Safety Code chapter 611, "Mental Health Records," provides, in section 611.002, that "records of the identity, diagnosis, evaluation, or treatment of a patient that are created or maintained by a professional, are confidential" and may be disclosed only as provided by sections 611.004 and 611.0045. Section 611.0045 provides for the release to a patient or his parent, guardian, or designee, of the patient's own records. Section 611.004 authorizes disclosure to various persons or entities for example audits or "research" (where the records are deidentified), payment purposes, legislative inquiries, perhaps pertinent here are subsections (a)(1) and (2) which allow a professional to disclose records to "a governmental agency if the disclosure is required or authorized by law" and, "to medical or law enforcement personnel if the professional determines there is a probability of imminent physical injury by the patient to the patient or others or there is a probability of immediate mental or emotional injury to the patient."

In addition to chapters 595 and 611 of the Health and Safety Code, your predecessor also refers to federal regulations pertaining to records of clients receiving chemical dependency services, found in title 42 of the Code of Federal Regulations, Part 2. These regulations, adopted under title 42 of the United States Code, sections 290dd-3 and

290ee-3, prohibit record disclosure absent patient consent except to medical personnel in emergencies, for audit and scientific research purposes, or pursuant to court order. Section 2.64(d) of these regulations permits a court to order disclosure where the information is not otherwise available and the public interest outweighs injury to the patient. We understand, too, that other provisions of law regarding confidentiality of records may be implicated by the concerns your predecessor raises. *See, e.g.,* Health & Safety Code § 576.005 (confidentiality of records of a mental health facility).

Reciting the above-referenced statutes and regulations as their authority, the department has adopted extensive rules with regard to disclosure of "client-identifying information" for the use of its staff and the public. 25 T.A.C. ch. 403, subch. K. The rules appear to aim at comprehensiveness. We do not understand your predecessor to raise concerns as to the validity of these rules, and we assume their legal adequacy for purposes of this opinion. The rules essentially break down department records into three types--those of clients receiving "mental health services," "mental retardation services" and "chemical dependency services"--and provide for disclosing or withholding records for each type depending on whether adequate consent to release them has been obtained.

We believe that threshold issue to all the questions your predecessor presents is whether the Brady Act requires or authorizes disclosure of information to a law enforcement officer performing the subsection (s)(2) research where disclosure would otherwise be prohibited. In our opinion, the Brady Act does not have such effect. The act directs law enforcement officers to make "reasonable efforts" to determine the eligibility of individuals to obtain handguns, "including research in whatever State and local recordkeeping systems are available." We find nothing in the Brady Act which purports to alter whether given state or local records are "available" for purposes of the act, that is, to make otherwise unavailable records "available" for the law enforcement officers performing the research under the act.

Notably, another provision of the Brady Act, section 103(e) of Public Law No. 103-159, expressly permits the Attorney General, "[n]otwithstanding any other law, to obtain "from any department or agency of the United States" information on persons for whom receipt of a firearm would be unlawful. Presumably, Congress could have chosen to afford local law enforcement officers carrying out research under the act similar authority to obtain records "notwithstanding other law." It did not.

Of course department records sought by law enforcement officers performing Brady Act research may in certain cases be available to them under existing state law and regulations--for example, where there is the requisite consent, where a court orders disclosure, or where a "professional" determines that there is a threat of injury to the client or others. *See, e.g.,* Health & Safety Code §§ 595.003, .005, 611.004(a)(2).[6] But again,

---

[6]Although your predecessor does not specifically ask about this, we would caution that, given the detailed provisions in state law for the disclosure of the records at issue here, we do not believe that, without specific authority, they may be disclosed to other governmental entities and officials, such as law enforcement officers, without violating the records' confidentiality--even though in other contexts

we do not believe the Brady Act in itself makes otherwise unavailable records of the department "available" to law enforcement officers for purposes of their performing the research required by the act. In view of this determination, we do not think it necessary to respond specifically to the various permutations in which your predecessor presents his questions.[7]

## S U M M A R Y

The federal Brady Act, in directing certain law enforcement officers to research "available" records in order to determine lawfulness of a person's obtaining a handgun, does not require or authorize the Department of Mental Health and Mental Retardation to disclose client records which are otherwise confidential and unavailable to such officers under state law. This opinion does not address which particular records are or are not available to such officers under state law.

Yours very truly,

DAN MORALES
Attorney General of Texas

---

(footnotes continued)
confidential records may sometimes lawfully be shared between governmental entities. *See, e.g.,* Attorney General Opinion JM-590 (1986). We would also note specifically with reference to the confidentiality exception in section 611.004(a)(1) of the Health and Safety Code, referenced in your predecessor's request, which section allows a professional to disclose records to "a governmental agency if the disclosure is required or authorized by law," that for the reasons stated above we do not believe the Brady Act in itself operates either to "require" or "authorize" disclosure within the meaning of section 611.004(a)(1). *See, e.g.,* Attorney General Opinion JM-838 (1988). While the Brady Act may "require" or "authorize" a law enforcement officer to research "available" records, it cannot, we think, be read to "require" or "authorize" the department to disclose them. *Cf. e.g.,* Hum. Res. Code § 48.0385 (Department of Human Services "shall have access" to records necessary to performance of duties under chapter 48, protective services for elderly).

[7]We note that the result we reach here--that the Brady Act does not make otherwise unavailable records available to the extent that they are records of a person "who has been adjudicated as a mental defective or who has been committed to a mental institution"--relieves the department of having to determine which records fall into those categories. It may not be immediately apparent in state law who should be considered as having been "adjudicated as a mental defective" or "committed to any mental institution" under the Brady Act. *See, e.g., United States v. Hansel,* 474 F.2d 1120 (8th Cir. 1973) (scope of term "mental defective).

p. 1885

JORGE VEGA
First Assistant Attorney General

SARAH J. SHIRLEY
Chair, Opinion Committee

Prepared by William Walker
Assistant Attorney General